Kelvin BLATCH, By His Next Friend Robert CLAY, Kenneth Blatch, By His Next Friend Wilhemina Peay, Julia Gottleib, By Her Guardian Ad Litem Karla Sanchez, Erica Mortimer, Flora Cruz & Mark Bryer, By Their Guardian Ad Litem Leonard Herbst, Louise Smalls & Luis Perez, By Their Guardian Ad Litem Paul Dalonky, Peggy O'Neill Morton, By Her Guardian Ad Litem Marcella Silverman, Olga Alsaa, By Her Next Friend Vanessa Clark, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Tino HERNANDEZ, Chairman of the New York City Housing Authority, Stuart G. Laurence, as Hearing Officer for the New York City Housing Authority, and the New York City Housing Authority, Defendants.

No. 97CIV.3918(LTS)(HBP).

United States District Court, S.D. New York.

March 30, 2005.

The Legal Aid Society, Health Law Unit
by Elisabeth Ryden Benjamin, Esq., Sam-
uel B. Davol, Esq., Lisa B. Sbrana, Esq.,

Lilliana Vaamonde, Esq., Janet Sabel, Esq., Civil Appeals and Law Reform Unit by Scott Rosenberg, Esq., Judith Goldiner, Esq., Ronald J. Tabak, Esq., New York City, for Plaintiffs.

New York City Housing Authority by Jeffrey Schanback, Esq., Mario G. Frangiose, Esq., Sonya M. Kaloyanides, Esq., New York City, for Defendants.

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

SWAIN, District Judge.

This is a class action lawsuit brought by mentally disabled tenants and occupants of New York City Housing Authority ("NYCHA") public housing who have been subject to eviction proceedings. Plaintiffs seek declaratory relief and damages, asserting that defendants NYCHA, Tino Hernandez (as Chairman of the NYCHA)[1] and Stuart G. Laurence (as Hearing Officer for the NYCHA) (collectively, "Defendants") have violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, et seq., Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794, and the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3604.[2] Plaintiffs also seek declaratory and injunctive relief as to each named Plaintiff in connection with NYCHA tenancy termination or eviction proceedings that were apparently pending as of the time the Amended Class Action Complaint (the "Complaint") was filed. The Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

The Court has reviewed and considered thoroughly the parties' thousands of pages of evidentiary and argumentative submissions in connection with the instant motions. For the following reasons, the parties' motions are granted in part and denied in part.

## I. BACKGROUND

Plaintiffs' claims in this action arise from NYCHA's handling of tenants and occupants with mental disabilities, and tenancy problems allegedly arising from such disabilities, both in the context of legal proceedings directed toward termination of tenancies or eviction and in interactions leading up to such proceedings. Plaintiffs argue that NYCHA fails to recognize and accommodate appropriately mental disabilities, including tenancy problems allegedly arising from such disabilities, and that the mentally disabled are denied due process in the context of administrative tenancy termination proceedings arising from lease or public housing rule violations and in court proceedings brought by NYCHA on account of non-payment of rent. Both these claims and the defenses that have

1. Tino Hernandez, the current Chairman of the NYCHA, is hereby substituted as an official-capacity defendant pursuant to Fed. R.Civ.P. 25(d)(1).

2. Neither the parties' motion papers nor the Amended Complaint, all of which focus on NYCHA policies and practices, explains the precise nature or legal basis of the claims asserted against Defendants Hernandez and Laurence in their official capacities. In this

opinion, the Court generally will refer only to NYCHA in discussing Plaintiffs' claims, unless the particular assertion specifically relates to action by one of the individually-named Defendants. To the extent Plaintiffs' claims survive this decision, the Court will expect Plaintiffs to clarify the nature and basis of their claims against the two individually-named Defendants.

been raised focus on NYCHA's procedures (or alleged lack thereof) for conducting tenancy-related legal proceedings and for dealing with actual or suspected mental disabilities in connection therewith. Accordingly, the following general background section of this opinion will deal primarily with NYCHA's procedures. The parties' factual contentions regarding events or proceedings specific to particular named Plaintiffs or class members · will principally be addressed in the body of the opinion, in connection with specific legal issues.

The following facts are undisputed unless characterized as claims or allegations. Defendant NYCHA is a public benefit corporation established to provide housing to low-income New York City residents. (Defendants' Rule 56.1 Statement ¶ 1.[3]) NYCHA owns and manages more than 340 housing projects consisting of more than 3,000 buildings containing more than 180,-000 apartments, in which more than 600,-000 individuals reside. (*Id.* ¶ 2.) As part of its responsibilities in maintaining the public housing units, NYCHA is charged with the duty of terminating the tenancies of residents who violate the terms of their leases or housing rules or regulations. (*Id.* ¶ 3.) The relevant rules and lease terms include prohibitions on criminal drug use on or near NYCHA's properties and tenant obligations to act in a manner that will be conducive to maintaining the housing project in "a decent, safe and sanitary condition." *See* 24 C.F.R. § 966.4 (2005) (detailing required lease terms for

public housing units). Some of the lease provisions are required by federal law,[4] which also requires strict attention to rent payment and collection issues.[5]

Plaintiffs are members and representatives of a class of NYCHA residents with mental disabilities who have been subject to tenancy termination or eviction actions. Judge Denny Chin of this Court certified the plaintiff class in this litigation pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure by order dated December 1, 1999, which provides that the class is comprised of:

> Present, past and future tenants and/or occupants with mental disabilities who reside, resided or seek to reside in housing owned and operated by NYCHA and are, were or may be the subject of administrative grievances and/or tenancy termination proceedings and/or eviction proceedings in housing court or appeals from NYCHA's administrative determinations in State Supreme Court. In the case of past tenants and occupants with mental disabilities, they are members of the class only if the proceedings against them were pending at some point within the three-year period prior to the filing of this action.

*Blatch et al. v. Franco et al.,* No. 97 Civ. 3918(DC), Docket item no. 40 (S.D.N.Y. Dec. 1, 1999). As will be explained *infra* in greater detail, Plaintiffs claim in their Complaint that class members' rights under the Due Process Clause and the above-cited civil rights statutes have been violat-

---

**3.** All references to statements submitted pursuant to Local Civil Rule 56.1 of this Court refer as well to the underlying evidence cited therein.

**4.** *See* 42 U.S.C.A. § 1437d(*l*)(6) (2003) (requiring lease clause defining criminal activity threatening health, safety or right of other residents to peaceful enjoyment, and "any drug-related criminal activity on or off ...

premises," as "cause for termination of tenancy.")

**5.** *See* 42 U.S.C.A. § 1437d(c)(4)(B) (2003) (requiring NYCHA to aggressively pursue delinquent accounts "to assure the prompt payment and collection of rents and the prompt processing of evictions in the case of nonpayment of rent.")

ed in connection with administrative grievance,[6] administrative tenancy termination and/or Housing Court[7] non-payment or eviction proceedings commenced by NYCHA.

## A. Tenancy–Related Legal Proceedings

The challenged NYCHA legal actions generally follow one of two tracks. In cases of alleged lease or NYCHA tenant conduct rule violations, NYCHA may initiate internal administrative termination of tenancy proceedings, in which lease or rule violation charges are brought and adjudicated within NYCHA's administrative structure, and through which lease rights may be terminated, prior to seeking a judgment of possession and warrant of eviction in Housing Court. Where the issue is non-payment of rent, NYCHA may commence non-payment proceedings seeking a judgment of possession, and eventual eviction, directly in Housing Court without prior internal administrative proceedings.

The two types of proceedings are not mutually exclusive and, depending on the factual circumstances of a particular tenancy, both types of proceedings may be pursued with respect to a given tenant. (Plaintiffs' Rule 56.1 Statement ¶¶ 4–6.) For instance, internal administrative tenancy termination proceedings may be initiated based on "chronic rent delinquency" where a tenant has repeatedly been late in paying rent. A non-payment proceeding may be commenced based on default on a single rent payment. Similarly, tenants who have allegedly violated lease terms or NYCHA conduct rules may have also defaulted on rent. See Dep. of Ynoemia Cruz, Vol. VI of Plaintiffs' Exhibits,[8] at 34 (non-payment proceedings); Ex. A to Graziano Decl. (N.Y.CHA Tenancy Termination Procedures) (hereinafter "Termination Procedures").

NYCHA's procedures in connection with both types of actions include administrative efforts to effect practical resolution of the tenancy or non-payment issues with respect to both disabled and non-disabled tenants. Such efforts consist principally of contact with family members or outside agencies with which the tenant may already be involved (e.g., welfare agencies, social workers, or the Protective Services for Adults ("PSA") division of New York City's Human Resources Administration ("HRA")) in efforts to obtain rent payment coordination or support, or other supportive services that may, with the tenant's cooperation, obviate rule infraction problems like unsanitary housekeeping. See,

---

**6.** Plaintiffs' reference to administrative "grievance" proceedings appears to relate to internal NYCHA proceedings, similar in procedural features to tenancy termination proceedings, in which tenants may challenge Housing Authority actions, including alleged failures to provide reasonable accommodations. See, e.g., Ex. D to Decl. of Paul Graziano (N.Y.CHA ADA/Section 504 Grievance Procedure and NYCHA Grievance Procedures). Because, however, the parties' evidence and arguments regarding NYCHA's administrative proceedings focus on events and alleged procedural deficits associated with tenancy termination proceedings rather than grievance proceedings, the Court's analysis will focus on the former.

**7.** The Term "Housing Court" as used herein refers to the Housing Part of the Civil Court of the City of New York.

**8.** Plaintiffs' exhibits in connection with this motion are compiled in nine bound volumes (the first of which also contains Plaintiffs' Notice of Cross–Motion), designated with roman numerals, and are listed in the Declaration of Elisabeth R. Benjamin in Support of Plaintiffs' Cross–Motion. The exhibits other than deposition transcripts and affidavits are further designated with arabic numbers. In this opinion, they will generally be referred to by volume number and, where applicable, the arabic exhibit number, viz., Plaintiffs' Exhibit 8 appearing in Volume II may be referred to as PX II/8.

e.g., Dep. of May Law Wong (PX VI) at 24 (all tenants with eviction proceedings are referred for social services); Dep. of Frances Bultron (PX VI) at 65 (Social Services department "cannot mandate a resident to accept services"); Cruz Dep. (PX VI) at 74 (referral to Social Services department if tenant is "at risk" for any reason; "our intention is not to evict anyone, it is to solve the problem"). Defendants represent that sixty percent of the administrative tenancy termination proceedings brought during 1998 "were resolved through the efforts of the housing managers working with the tenants and appropriate social services agencies," and that "[l]ess than five percent ended with an actual eviction." (Graziano Decl. at ¶ 26.)

The principal features of NYCHA's tenancy-related legal procedures, and those of certain procedures NYCHA has adopted for dealing with tenancy-related problems of mentally disabled persons, can be summarized as follows.

### 1. *Administrative Tenancy Termination Procedures*

NYCHA's current procedures for administrative tenancy terminations were first adopted through a consent decree entered in *Escalera v. New York City Housing Authority,* 425 F.2d 853 (2d Cir. 1970), and were later modified by further consent decrees.[9] Those procedures define a multi-level process. When a problem arises with a tenancy, the first step is for the project's Housing Manager (or an assistant or other representative working under the manager's supervision) to interview the tenant in order to discuss the problem that could lead to termination of the tenancy and, when appropriate, assist the tenant by securing outside help, includ-

ing from social services agencies. (Termination Procedures; DR 56.1 ¶ 8.) If the project manager continues to believe that tenancy termination is warranted, he or she sends the tenant's file and a written recommendation to NYCHA's Tenancy Administrator, who, if he or she agrees that termination may be necessary, sends the file to NYCHA's Law Department to prepare a notice of charges, setting forth the grounds for termination and a hearing date. (DR 56.1 ¶ 8.)

The written notice of charges includes notice to the tenant that he or she may be represented at the hearing by counsel or anyone else of his or her choosing and that the hearing is important because it may result in eviction. (*Id.*) Specifically, the notice states that a recommendation has been made that the individual's tenancy be terminated for the reasons identified in an attached specification of charges, that a hearing is to be held, and includes additional information, some of which is printed in capital letters, as follows:

> At the hearing, you may appear in person with such witnesses as you may desire, *AND BE REPRESENTED BY COUNSEL OR OTHER REPRESENTATIVES OF YOUR CHOICE.* If you desire legal representation and cannot afford a lawyer, it is suggested that you contact one of the agencies which provide free legal services. A copy of the procedures covering these proceedings is enclosed for your information.

> IT IS IMPORTANT THAT YOU REALIZE THAT THIS HEARING WILL BE THE ONLY OPPORTUNITY TO BE HEARD, THAT THE DETERMINATION BASED THEREON MAY RESULT IN YOUR EVICTION, AND THAT SUCH DETERMINATION

---

**9.** *See generally Escalera v. New York Housing Auth.,* 924 F.Supp. 1323 (S.D.N.Y.1996) (discussing consent decrees entered in *Tyson–*

*Randolph et al. v. New York City Housing Auth.,* 74 Civ. 1856 (S.D.N.Y.1975)); Termination Procedures.

MAY NOT BE CHALLENGED IN THE LANDLORD–TENANT COURT. ACCORDINGLY, IF YOU DESIRE TO CONTEST THE ABOVE CHARGES, YOU MAY REPLY TO THIS NOTICE AND APPEAR AT THE HEARING. OTHERWISE, YOU WILL BE DEEMED TO HAVE WAIVED YOUR RIGHT TO SUCH A HEARING.

(Ex. B to Aff. of Todd Hyman.)

The administrative hearing is conducted by an Impartial Hearing Officer ("IHO"). At the administrative hearing, NYCHA's position is advocated by a representative of its Law Department; the Law Department proffers portions of the tenant record for consideration by the IHO, witness testimony may be presented and cross-examined, and documentary evidence may be presented. Subpoenas are to be issued if requested by the tenant or tenant's representative. Before the hearing concludes, the tenant or tenant's representative is permitted to make a statement in mitigation as to why the tenancy should not be terminated, including matters relating to a family situation or extenuating circumstances. (Termination Procedures §§ 6, 7; NYCHA Management Manual (PX I/5) at 23.) The IHO considers only the evidence proffered by the parties and does not raise issues that are not contested by the parties or that would call for additional evidence. (*See, e.g.,* Dep. of Stuart G. Laurence (PX VI) at 51, 62–63, 125, 134.)

NYCHA does not provide the IHO with any tenant history or other information in NYCHA's possession that may indicate that the tenant suffers from a mental disability. (*See, e.g. id.,* at 65, 69, 123, 125, 141, 142; Dep. of Eddie Emeric (PX VI) at 27.)

The IHO renders a written decision following the hearing, based solely on the testimony, documents and physical evidence presented at the hearing. If the tenant does not appear at the hearing, the IHO makes a written decision based on the record proffered by the NYCHA representative. (Termination Procedures § 8; DR 56.1 ¶ 9.) If the IHO finds that any charge has been proven, the IHO has the power to make dispositions ranging from termination of tenancy, to "probation," to "[e]ligible [for continued tenancy] with referral to Social Services." (Termination Procedures § 10.)

A copy of the decision and recommendation is sent to the tenant. (DR 56.1 ¶ 11.) The IHO's decision is binding on NYCHA and can be implemented immediately, but is subject to review by the members of the Board of the Housing Authority (the "Board"). NYCHA policy provides that, in reviewing the IHO's decision, the Board "shall be limited to whether the decision of the [IHO] is contrary to any applicable . . . law or violates . . . Authority procedures by reason of any procedural irregularity." (Termination Procedures § 11.) The Termination Procedures provide that, upon the tenant's application within a reasonable time after the default, the IHO can reopen the default and set a new hearing date "for good cause shown." (*Id.* § 8; Management Manual (PX I/5) at 24.) Paul Graziano, NYCHA's General Manager, asserts that the tenant is required to show "a reasonable excuse for failing to appear and a meritorious defense to the charge against his tenancy" in order to have a default vacated. (Graziano Decl. ¶ 18.)

IHOs do not advocate for either side and do not have authority to appoint guardians for tenants who are the subject of termination proceedings. (Decl. of Joan Pannell ¶ 6; Laurence Dep. at 90.) They do, however, have authority to adjourn proceedings. (Termination Procedures § 5.) Although a December 1997 policy memorandum instructs IHOs to stop and

adjourn hearings if a tenant "appears to be incapable of adequately defending his rights and ... is unrepresented," IHOs are not trained in recognizing the symptoms of mental illness, and there is nothing in the record to indicate that IHOs have been trained to apply any uniform standards in determining whether a tenant appears to be incapable of defending his or her rights. (*See* December 1, 1997, Memorandum to Impartial Hearing Officers from Ronald J. Segedy ("Segedy Memorandum"), Ex. G. to Expert Rep. of Dr. Robert L. Goldstein; Laurence Dep. at 97–99.)

A tenant may challenge NYCHA's administrative determination by commencing an Article 78 proceeding in state court within four months of NYCHA's determination.[10] (Management Manual (PX I/5) at 28.) Following an NYCHA determination that terminates a tenancy, NYCHA may issue a Notice to Vacate and, if the tenant does not vacate in response to the notice, may commence a summary holdover proceeding in Housing Court to evict the tenant. The merits of the underlying administrative proceeding cannot be relitigated in the holdover proceeding. (*See* Management Manual (PX I/5) at 27–28, 43–51.)

### 2. *Non–Payment Proceedings*

Where a tenant has failed to pay rent on a timely basis and NYCHA wishes to pursue a judgment for the arrears and for possession of the unit on that basis, neither NYCHA's administrative tenancy termination procedures nor the *Escalera* decision requires NYCHA to conduct internal hearings or other proceedings. Rather, NYCHA may initiate a summary "Non–Payment of Rent" proceeding in Housing Court, seeking a judgment of possession terminating the tenant's right to occupy the premises and, upon the tenant's failure to pay the rent arrears within the time allotted, a warrant of eviction. (DR 56.1 ¶ 16; PR 56.1 ¶¶ 16–19; Management Manual (PX I/5) at 54–58.) Once a Final Judgment of Possession is entered in Housing Court, NYCHA may seek a warrant for the resident's eviction. (PR 56.1 ¶ 19.)

There is nothing in the record to indicate that NYCHA, which is represented in Housing Court proceedings by its Law Department, provides the tribunal with information in its possession indicating that a tenant against whom it is seeking relief may be mentally disabled, even if the tenant does not appear for the Housing Court proceeding and NYCHA consequently seeks a judgment of possession by default. Nor does it appear that NYCHA has any procedures for requesting that the Housing Court provide a tenant in need of such representation with a guardian ad litem or advocate in connection with the summary proceedings. Under certain circumstances, NYCHA brings the proceeding to

---

**10.** Article 78 of the New York Civil Practice Law and Rules provides, in relevant part, that:

The only questions that may be raised in a proceeding under this article are:
1. whether the body or officer failed to perform a duty enjoined upon it by law; or
2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or
3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or
4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.

N.Y. Civ. Prac. L. & R. § 7803 (McKinney 1994).

the attention of outside social services agencies, such as PSA, which may seek to intervene on the tenant's behalf or obtain the appointment of a guardian.

The warrant of eviction is executed by a City Marshal after a 72–hour notice of eviction is served on the tenant. (Management Manual (PX I/5) at 64.) NYCHA's procedures call for it to notify the Marshal that tenants who are elderly, mentally or physically disabled, or mentally or emotionally disturbed, are "at risk" when NYCHA seeks execution of a warrant of eviction. (Management Manual (PX I/5) at 62; Ex. H. to Goldstein Rep.)

The Marshal's procedures upon such notification call for an effort to obtain preventive or supportive services for the "at risk" tenant through PSA. (Ex. H to Goldstein Rep.) PSA sometimes prevents such evictions by paying a tenant's rent arrears. NYCHA asserts that PSA generally only makes such payments after a warrant of eviction has been issued, and frequently waits until the eve of eviction before taking action on a tenant's behalf. (*See, e.g.,* PR 56.1 ¶¶ 133, 147.)

## B. *NYCHA's Provisions for Mentally Disabled Residents in Connection with Tenancy Proceedings*

NYCHA has no specific procedure for offering accommodations or rule modifications to mentally disabled tenants in connection with the conduct of either administrative termination hearings or Housing Court proceedings. However, NYCHA has adopted procedures for soliciting self-identification of disabled persons who are seeking accommodations, and has also adopted special procedures for dealing with lease termination issues involving the mentally disabled. Some of the procedures were adopted after the instant class action litigation was commenced.

### 1. *Self–Identification by Persons Seeking Accommodations*

On an annual basis, NYCHA solicits self-identification by disabled residents (including identification of disabled household members) and requests for accommodation through a "Disability Status and Notice of Reasonable Accommodation" form that is included in NYCHA's annual income-verification mailing to tenants. (DR 56.1 ¶ 17; Ex. D to Goldstein Rep.; Graziano Decl. ¶ 18.) Although Plaintiffs contend that the text of the form is insufficient to notify recipients that accommodations for mental disabilities are available (and is thus unlikely to elicit appropriate responses by or on behalf of the mentally disabled), some 15,192 residents had, as of August 23, 2000, used the form to identify one or more members of their household as mentally disabled. (DR 56.1 ¶ 18; Declaration of Saul Mackler ¶ 5.) It is also clear that some persons with mental disabilities, including some of the named Plaintiffs in this action, do not identify themselves as disabled and do not affirmatively request accommodations. Such reluctance to self-identify is often a byproduct of the mental condition itself or a fear of stigma associated with identification as mentally disabled. (Dr. Zonona Expert Report (PX VII) at 4–5; *see also, e.g.,* Declaration of Dr. Philip J. Hauptman (PX VII) at ¶¶ 57, 66, 98, 102.)

NYCHA also maintains a Department of Equal Opportunity ("DEO"), which is designed to assist disabled residents in securing housing accommodations as well as in understanding management policies and procedures and other issues related to the residents' housing needs. (DR 56.1 ¶ 19.) DEO has a designated Section 504 Coordinator, who implements an internal grievance procedure to resolve discrimination complaints and who provides an additional level of review for project-level decisions

regarding requests for reasonable accommodation. (*Id.;* Graziano Decl. ¶¶ 30–31.)

NYCHA asserts that there are several safeguards within its tenancy termination and non-payment eviction procedures that protect the constitutional and statutory rights of residents with mental disabilities. These include consultations with project management and case reviews before administrative termination proceedings are commenced, references of tenants to NYCHA's Social Services department as liaison to outside agencies for financial or other support, either before or during the course of termination or non-payment proceedings, and a Memorandum of Understanding pursuant to which NYCHA notifies the HRA well in advance of certain "at risk" evictions.

### 2. *1995 NYCHA/HRA Memorandum of Understanding*

The 1995 Memorandum of Understanding ("MOU") between NYCHA and HRA provides that NYCHA is to notify HRA 45 days before its proposed date for eviction, in connection with non-payment proceedings, of any "at risk" [11] tenant who is a recipient of welfare benefits from the Department of Social Services. Pursuant to the MOU, NYCHA is not to go forward with the eviction if the full rent arrears amount stated in the notice is paid within the 45 day period, but NYCHA reserves the right to take further legal action if the payment does not cover additional amounts of accrued rent postdating the notice. (MOU (PX II/9) ¶¶ 1–3.)

Plaintiffs assert that the 1995 MOU's use of welfare benefit recipient status as the eligibility criterion for this procedure skews the protections of this program against the mentally disabled. According to Plaintiffs, most mentally disabled tenants receive federal SSI disability benefits rather than welfare. Indeed, it is undisputed that the named Plaintiffs are on SSI rather than welfare. (*See, e.g.,* Goldstein Rep. at 13 (Alsaa), 17 (Bryer), 19 (Cruz), 22 (Smalls), 27 (Morton), 29 (Mortimer), 35, 39 (Blatch brothers).) The MOU further provides that, in tenancy termination proceedings involving tenants whom NYCHA deems "mentally incapacitated" [12] (regardless of whether such tenants are welfare recipients), NYCHA must notify PSA after NYCHA's Department of Resident Review and Counseling (apparently the predecessor to the current Tenancy Administration Division of Operation Services ("OSTA") [13]) "receives and does an

---

**11.** The MOU defines "at risk" by reference to a New York City Department of Investigations, Bureau of City Marshals, Handbook, which does not appear to be part of the voluminous record on the instant motions. (*See* MOU n. 2.) Marshals' documents appended to Defendants' expert report refer to special precautions in connection with evictions in order to protect "someone who is blind, deaf or otherwise handicapped, a mentally ill or physically infirm individual, or an elderly person who for one reason or another is unable to fend for his [sic] or herself." (Ex. H to Goldstein Rep. (June 18, 1981 Appendix Q–103).)

**12.** The MOU defines "mentally incapacitated" by reference to section 81.02 of the New York Mental Hygiene Law, which provides in pertinent part that

The determination of incapacity shall ... consist of a determination that a person is likely to suffer harm because:

    1. the person is unable to provide for personal needs and/or property management; and

    2. the person cannot adequately understand and appreciate the nature and consequences of such inability.

N.Y. Mental Hyg. Law § 81.02(b).

**13.** OSTA is the NYCHA unit that is responsible for "assisting in executing the administrative procedures implemented by the Housing Authority pursuant to the *Tyson/Randolph* and *Escalera* Decrees." (Decl. of Nora Reissig-Lazzaro at ¶ 4.)

initial evaluation on a case referred to it for termination, but before the tenancy is terminated," if the tenant has not previously been referred to PSA. The MOU makes no particular provision for action by PSA under such circumstances. (MOU ¶ 4.) [14]

NYCHA maintains no policy or procedure, in writing or otherwise, that addresses the subject of competence to advocate on one's behalf. (Defs' Resp. to Not. of Dep. on Written Questions at Q. 35 (PX II/15).)

### 3. Procedures Instituted After Commencement of This Litigation

Since the commencement of the instant litigation, NYCHA has published two memoranda setting forth additional procedures to be followed in tenancy termination cases involving mentally disabled residents: the December 1997 Segedy Memorandum regarding the conduct of proceedings before IHOs; and an April 1999 General Memorandum regarding evaluations and preventive actions in connection with contemplated administrative tenancy terminations.

### (a) Segedy Memorandum

As noted above, the Segedy Memorandum to IHOs directs that if, during the course of the hearing, the tenant "(1) appears to be incapable of adequately defending his rights, and (2) is unrepresented," the IHO should terminate the session, adjourn the hearing, and refer the matter to OSTA for initiation of an evaluation through NYCHA's Social Services division.[15] The memorandum continues:

> If the evaluation of Social Services indicates that the tenant does not require referral to PSA, the [IHO] may continue the hearing on the adjourned date. If Social Services evaluates the tenant as requiring referral to PSA, Social Services or OSTA will notify PSA and the hearing office. The [IHO] should not recommence the hearing where a tenant has been referred to PSA until either PSA indicates that (s)he is not eligible under their guidelines or appropriate arrangements have been made for a guardian and/or representative.

Segedy Mem. (Ex. B to Graziano Decl.) at 2. Frances Bultron, the Administrator of NYCHA's Social Services division, testified that she believes that PSA's eligibility criteria cover physically or mentally impaired people who do "not have any outside assistance." (Bultron Dep. (PX VI) at 9, 15, 43.)

---

**14.** NYCHA personnel involved in making referrals under this and other procedures discussed below displayed differing interpretations of the contours of the "at risk" designation, as well as of the meaning of "mentally incapacitated" and other terms relating to mental status that are used in the procedures discussed in this section. See, e.g., Dep. of Yvonne Behlin (PX VI) at 48–50, 140; Cruz Dep. (PX VI) at 40, 47, 73–74, 85–88; Bultron Dep. (PX VI) at 75, 93, 142; Emeric Dep. (PX VI) at 38–39, 44, 56; Dep. of Ronaldo Sevilla (PX VI) at 71–73; Wong Dep. (PX VI) at 26–28, 55, 62–63, 71.

**15.** The organizational structure and functions of the Social Services division are described in the Reissig–Lazzaro declaration, which is annexed to Defendants' Notice of Motion. Among other things, the Social Services division acts as a liaison between NYCHA and outside social services agencies. According to Reissig–Lazzaro, OSTA's Assistant Director, NYCHA relies on PSA "to provide services such as heavy duty cleaning for tenants who are charged with poor housekeeping, to arrange for financial management and direct vendor payment for tenants who are charged with chronic rent delinquency and/or non-payment of rent, and to obtain guardians for those tenant[s] who appear mentally incompetent." (Decl. of Nora Reissig–Lazzaro at ¶ 5.)

The Segedy Memorandum does not offer any instructions as to how the IHO should deal with the conduct of the resumed hearing in the event the OSTA/PSA reference does not result in guardianship or representation and the tenant still "appears incapable of adequately defending his rights." Defendant Laurence, an IHO, testified that in such an event he would continue to adjourn the hearing until instructed by the NYCHA as to how to proceed. (Laurence Dep. (PX VI) at 57, 163.) The record does not contain any indication that NYCHA's procedures include protocols for IHO determinations as to tenant competency to defend tenancy termination proceedings or provide IHOs with tools other than adjournments and Social Services division referrals to address directly competency issues when they do arise.

(b) *GM–3630*

General Memorandum 3630, entitled "Termination of Tenancy: Mentally Incapacitated Tenant" ("GM–3630"), establishes a procedure under which a project Housing Manager (or delegate) who is considering commencing proceedings for termination of a tenancy is to refer a tenant suspected of having a mental disability to NYCHA's Social Services division for a written evaluation of the individual's mental capacity and suggested "corrective action" if possible, prior to the institution of termination proceedings. (GM–3630, Apr. 29, 1999 (PX II/11) at I, II.) GM–3630 provides for such referrals for tenants "who may be mentally incapacitated." It defines "mentally incapacitated" by reference to circumstances when, based on information in the tenant's file or personally known to NYCHA personnel, it appears that because of mental disease or defect the tenant:

- may be unable to provide for his/her needs and is likely to suffer harm or cause harm to others;
- is hospitalized for a serious psychiatric or psychological disorder; or
- has exhibited seriously confused or disordered thinking that may render him/her incapable of understanding the termination of tenancy hearing process and defending against the charges.

(*Id.* at II.) The Housing Manager is to submit a request to NYCHA's Social Services division for a written evaluation of the tenant's mental capacity "as well as a proposal for corrective action, if feasible." (PX II/11 at IIIA.) GM–3630 identifies "arranging for financial management, cleaning and/or housekeeping services, communication with family members or community-based social workers, [and] identification and request for the intervention of community based case management services" as examples of "[r]easonable corrective action." (*Id.* at IVA2.)

The Social Services division is to determine whether the tenant is mentally incapacitated, utilizing a referral to a Professional Consultant retained by NYCHA for a psychiatric evaluation and determination of mental capacity if necessary. The consultant's report is required to indicate "whether the appointment of a guardian or other representative is necessary if proceedings to terminate the tenancy would be commenced within the next 180 days." Social Services is not required to take any further action if the consultant's report "indicates that the tenant is incompetent and unlikely to benefit from corrective action." (*Id.* at IVA1.) If, however, the consultant's evaluation indicates that the tenant is competent,[16] the Social Services staff worker is to "submit a proposal detailing

---

**16.** GM–3630 does not define the terms "com- petent" and "incompetent." (PX II/11.)

corrective action that might assist in resolving the tenancy problems." (*Id.* at IVA2.)

The results of the Social Services evaluation are to be reported back to the Housing Manager. GM–3630 forbids the Housing Manager to forward the case to OSTA for termination processing before a report is received from Social Services; the report is to indicate "whether the tenant appears capable of understanding the termination of tenancy hearing process and responding to the charges, or whether a guardian or other representative is required." (*Id.* at IIIA, IVB.) If Social Services has informed the Housing Manager that "corrective action is not feasible," the Housing Manager can forward the case to OSTA for termination processing. The forwarded file is to include details as to the reasons for initiation of the Social Services referral. (*Id.* at IIID.) GM–3630 further provides that, if Social Services does intervene but the problem persists, the case may be forwarded for termination within a one-year period without requiring any further Social Services evaluation. (*Id.* at IIIE.)

OSTA staff are required to "screen cases to determine whether the tenant has been evaluated for mental capacity" and, where the Social Services report recommends the appointment of a law guardian, forward the case to NYCHA's Law Department "for the purpose of obtaining a guardian." The case is to be forwarded into termination proceedings only after the Law Department notifies OSTA that a guardian has been appointed. (*Id.* at V.) If OSTA receives a case in which there has been no evaluation and "the tenant appears to be mentally incapacitated," OSTA is to stop the termination proceeding and refer the case to Social Services for evaluation. (*Id.*)

GM–3630 further provides that if, at the hearing stage, the IHO or NYCHA legal representative "has reason to suspect that the tenant may be mentally incapacitated" and there has been no Social Services evaluation, the hearing is to be stayed, OSTA notified, and a Social Services referral initiated by OSTA. GM–3630 also provides for a Social Services referral in the event an IHO reopens a default if the application is made "on the ground of mental incapacity." (*Id.* at VI.)

Plaintiffs proffer, based on their review of documents produced by NYCHA in this action, that as of the time this motion was briefed, there was no evidence that any corrective action plan had ever been developed or implemented for a mentally disabled tenant. (Sealed Decl. of Samuel B. Davol at ¶ 21.)

As discussed *infra* in more detail, Plaintiffs have proffered evidence that, notwithstanding GM–3630 referrals of a number of class members, NYCHA instituted tenancy termination or non-payment proceedings against those class members prior to the completion of any evaluation of their capability to participate in the proceedings. Deposition testimony by members of NYCHA's project management and Social Services staff indicates a significant level of confusion regarding the responsibilities of the respective units and the standards applicable to determinations of mental incapacity or incompetency. *See* n. 14 *supra* and evidence cited therein. *Compare* Bultron Dep. at 74 (PX VI) (Social Services Administrator testifies that it is not role of herself or staff to determine whether a person is mentally incapacitated) *with* GM–3630 at IVA1 (Social Services staff to "[t]ake appropriate steps needed to determine whether or not the tenant is mentally incapacitated"). *See also, e.g.,* Cruz Dep. (PX VI) at 22 (Housing staff refer to Social Services if they think someone "might

need help"), 27 (would refer under GM 3630 if, for example, person appeared to be hallucinating or if there is documentation from a psychiatrist or "or something" indicating mental impairment); Bultron Dep. (PX VI) at 93 (use of "PSA" criteria to determine whether mental incapacity determination should be requested); Emeric Dep. (PX VI) at 38–39 (Housing Assistant testifies that tenant would have to "act crazy" for him to perceive mental disability), 51 (same person has never read or heard of GM–3630); Sevilla Dep. (PX VI) at 63 (Housing Assistant disclaims knowledge of procedure regarding commencement of termination proceedings against person with mental disability), 83 (same person believes that Social Services division determines, after referral, whether GM–3630 should apply).

(c) *Procedures in Connection with Non–Payment Proceedings*

GM–3630 does not apply to non-payment proceedings, which are commenced directly in Housing Court. (*See* GM–3630, § I; PX II/10 (Defs' interrogatory responses).) According to the Assistant Director of OSTA, when a tenant is designated as "at risk," [17] the case is not processed (*i.e.,* pursued in Housing Court) until the tenant has been in arrears for four months. (Reissig–Lazzaro Decl. ¶ 10.) It appears that in such non-payment cases NYCHA obtains relief in Landlord–Tenant Court, up to and including issuance of a warrant of eviction, but then will "notify HRA of the balance owed and grant them an additional 45 days after service of the warrant [of eviction] to permit HRA to assist the tenant in curing the breach." (*Id.*) [18]

Yvonne Behlin, Assistant Manager of NY-CHA's Non–Payment Review Unit similarly testified that at-risk referrals are not made until after Housing Court non-payment proceedings have been commenced. (Behlin Dep. (PX VI) at 22, 76–77.) If NYCHA obtains a judgment of possession and a warrant of eviction is issued before the rent arrears are paid "or HRA otherwise intervenes," NYCHA's procedure calls for notification of the City Marshal that the matter is an 'at risk' eviction when the warrant is forwarded for execution. (Reissig–Lazzaro Decl. ¶ 10.) Plaintiffs have proffered evidence, however, that in a number of cases in which NYCHA had initiated competency evaluation proceedings or had what Plaintiffs contend was clear evidence of mental disability, warrants of eviction were not flagged as "at-risk" cases. (Sealed Davol Decl. ¶¶ 14, 30.)

## II. DISCUSSION

Cross-motions for summary judgment are now before the Court. Summary judgment is to be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is considered material in this context "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if

---

**17.** It appears that, in at least some contexts, NYCHA uses the term "at risk" as shorthand for mental incapacity as defined by Article 81 of New York State's Mental Hygiene Law. *See supra* n. 12 (quoting N.Y. Mental Hyg. Law

§ 81.02(b)); *see also* Reissig–Lazzaro Decl. at ¶ 10 n. 2.

**18.** Reissig–Lazzaro is apparently referring to the 1995 NYCHA/MOU, as discussed *supra.*

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (internal citation omitted).

When considering a motion for summary judgment, the Court does not engage in fact-finding or weighing of credibility, but determines whether any material questions of fact are in dispute after resolving all ambiguities and drawing all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *Carlton v. Mystic Transp. Inc.,* 202 F.3d 129, 133 (2d Cir. 2000). Where, as here, there are cross-motions for summary judgment, "[e]ach movant must present sufficient evidence to satisfy its burden of proof on all material facts." *Morris v. New York City Employees' Retirement System,* 129 F.Supp.2d 599, 605 (S.D.N.Y.2001) (citing *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir. 1988)). Conclusory allegations, conjecture and speculation will not, however, suffice to create a genuine issue of fact. *Kerzer v. Kingly Manufacturing,* 156 F.3d 396, 400 (2d Cir.1998).

## A.  Overview of Plaintiffs' Claims

Plaintiffs allege that class members' rights to due process have been violated in a number of respects in connection with tenancy termination, non-payment and related proceedings. Specifically, they assert that Defendants' failure to suspend all such proceedings with respect to all class members "pending the appointment of a qualified attorney, a Guardian Ad Litem or some other representative who is experienced in NYCHA tenancy termination proceedings, Housing Court matters and the rights of people with mental disabilities, for the Plaintiff class … deprived the Plaintiff class of the opportunity to adequately represent themselves and retain their homes in violation of their rights under the Due Process Clause," the ADA, the Rehabilitation Act, and the FHAA. (First Cause of Action, Compl. ¶ 214.)

They further assert that Defendants' "failure to establish a mechanism for suspending administrative termination of tenancy and grievance hearings, settlement negotiations, Housing Court proceedings and Article 78 proceedings, pending the appointment of a qualified attorney, a guardian ad litem or some other representative who is experienced in NYCHA tenancy termination proceedings, Housing Court matters and the rights of people with mental disabilities, for NYCHA tenants with mental disabilities" violates the Due Process Clause, the ADA, the Rehabilitation Act, and the FHAA. (Second Cause of Action, Compl. ¶ 216.)

Plaintiffs also claim that Defendants' alleged "failure to make any reasonable accommodations in its [sic] practice [sic], rules, regulations and procedures for the named Plaintiffs' and the Plaintiff class' mental disabilities in lieu of, or when it initiates, prosecutes and conducts, administrative termination of tenancy and grievance hearings (including issuing terms and conditions short of eviction), settlement negotiations, Housing Court proceedings and Article 78 proceedings violates the Due Process Clause," the ADA, the Rehabilitation Act, and the FHAA. (Third Cause of Action, Compl. ¶ 218.)

Plaintiffs further assert that Defendants' entry into settlements with class members "and termination of their tenancies is arbitrary and capricious, lacks substantial evidence, and violates the Due Process Clause," the ADA, the Rehabilitation Act, and the FHAA. (Fourth Cause of Action, Compl. ¶ 220.)

Plaintiffs' prayer for relief includes requests that the Court enter a variety of declarations and injunctions nullifying or overturning as arbitrary and capricious and lacking in substantial evidence various state court orders, settlement stipulations and/or administrative orders entered in proceedings involving the named Plaintiffs.

Plaintiffs and Defendants, respectively, seek summary judgment as to all of these claims.

## B. *Due Process Claims*

The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Violations of the constitutional protection by persons acting under color of state law are actionable under 42 U.S.C. section 1983.

■■■ The Supreme Court has identified the factors to be considered in determining what process is due where a protected property interest is in jeopardy: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). "The fundamental requirement of

due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

### 1. *Protected Interest*

■■■ The parties do not dispute the tenant-Plaintiffs' satisfaction of the first element of the *Mathews* test; there is no question that such Plaintiffs have an important private interest in retaining their public housing lease and occupancy rights. Defendants contend, however, that class members who are merely occupants of NYCHA units do not have rights in the public housing that are protected by the due process clause, citing well settled New York state law holding that a relative of a tenant can be removed from premises without being made party to an eviction proceeding brought against the tenant. *See Loira v. Anagnastopolous,* 204 A.D.2d 608, 612 N.Y.S.2d 189 (2d Dep't 1994). Plaintiffs fail to proffer relevant authority to the contrary. They rely principally on two bankruptcy court decisions holding that persons with "colorable" rights as "remaining" family members under regulations of the federal Housing and Urban Development Department[19] have rights to grievance hearings to determine their "remaining" family member status prior to eviction. *See Fonseca v. Philadelphia Housing Auth.,* 110 B.R. 191 (Bkrtcy. E.D.Pa.1990); *Adams v. Philadelphia Housing Auth.,* 94 B.R. 838 (Bkrtcy. E.D.Pa.1989). In both of those cases, the principal tenant had died or moved out of the public housing unit and the debtor

---

**19.** These decisions apparently construe a predecessor provision to current regulation 24 C.F.R. § 966.53(f)(2), which defines the term "tenant," as used in HUD regulations relating to tenancy termination and grievance proceedings, to include "the adult person ... [w]ho resides in the unit, and who is the

*remaining* head of household of the tenant family residing in the dwelling unit." 24 C.F.R. § 966.53 (2005). NYCHA's Management Manual contains a similar remaining head of household provision. *See* PX I/5 at 36.

claimed to be the remaining adult family member entitled to a grievance process under the regulations.[20]

Plaintiffs have presented no evidence that the "occupant" members of the Class are in such a factual position. In that the regulation at issue in the bankruptcy court cases characterizes the remaining family members covered by the rule as "tenants" in any event, the Court's conclusions here with respect to the rights of tenant class members embrace such occupants. Accordingly, Defendants' motion for summary judgment on Plaintiffs' due process claims will be granted insofar as those claims are asserted on behalf of "occupants" who are not tenants of record.

### 2. *Other Matthews v. Eldridge Factors*

The strength of the Government's interest in fair and efficient administration of public housing is not a matter of particular dispute. The parties' disagreements as to the magnitude of the risk of erroneous deprivations, the incremental value of additional protective measures, and the nature and degree of burden that additional procedural requirements would entail are attributable principally to their different perspectives on the nature of rights to due process. Defendants take a holistic and result-oriented approach to the analysis, arguing that their numerous mechanisms for consultations, evaluations, referrals to outside social services agencies, and the like have, in the cases of most if not all class members, ultimately staved off eviction, thus obviating any due process problem and rendering superfluous any additional protections sought by Plaintiffs. Plaintiffs, focusing on the trial-type proceedings that are the basis for determinations negatively affecting class members' leasehold and occupancy rights, and on stays, reversals or vacaturs of those determinations after third-party intervention in the proceedings, argue a clear showing of risk of erroneous and avoidable deprivations.

While NYCHA's approach emphasizes salutary practices that, if properly and consistently implemented, may preclude the development of due process issues by staving off termination proceedings or be of great assistance to class members in preventing actual eviction, it misperceives the core due process question. The due process inquiry is properly focused on the contested-hearing phase of the various proceedings affecting tenants' legal rights and thus on the essential due process question identified in *Mathews v. Eldridge*—whether the affected interest-holder is afforded meaningful notice and a meaningful opportunity to be heard in connection with the termination of protected rights. It is from this latter perspective that the Court will analyze the parties' contentions in connection with Plaintiffs' due process claims.

### 3. *First and Second Causes of Action: Due Process Claim Concerning Necessity of Appointed Representation*

The Court first takes up Plaintiffs' broadest claims—that NYCHA's failure to appoint a guardian ad litem or some other expert representative in connection with each tenancy-related proceeding involving a mentally disabled person, and to suspend all such proceedings pending appointment

---

**20.** Plaintiffs' other authorities are even less apposite. *See Williams v. Somers,* 91 A.D.2d 545, 457 N.Y.S.2d 19 (1st Dep't 1982) (colessee as necessary party to declaratory judgment action regarding rights in property); *Teachers College v. Wolterding,* 77 Misc.2d 81, 351 N.Y.S.2d 587 (1974) (subtenant in actual occupancy and known to landlord should have been listed by name rather than as "John Doe" in caption of summary proceeding).

of such guardians or representatives, violates the Due Process Clause. Plaintiffs have failed to proffer evidence from which a rational factfinder could conclude that due process requires absolute entitlements and procedural bars of this sort in every such proceeding. While Plaintiffs have offered evidence (some of which will be discussed in more detail below) of incidents in which named Plaintiffs were, or appeared to be, unable to understand or respond appropriately to charges in the context of hearings, or failed to attend hearings because of emotional or other personal problems, there is no evidence of record from which a factfinder could rationally conclude, without engaging in unwarranted and unseemly stereotyping, that each and every member of this broadly-defined class of persons is so incapable of rational thought and coherent communication as to require the appointment of expert representation in order to enjoy a meaningful opportunity to be heard with regard to tenancy termination.

Plaintiffs have therefore failed to frame a genuine issue of material fact as to whether due process requires the appointment of a guardian or other expert representative in every matter involving the tenancy of a mentally-disabled person, and the suspension of all tenancy-related grievance and termination proceedings pending such appointment, in connection with all such proceedings involving members of the class. Defendants' motion for summary judgment is, accordingly, granted as to the due process claims asserted in Plaintiffs' First and Second Causes of Action.

4. *Third Cause of Action—Due Process Claim Concerning Failure to Make Accommodations*

Plaintiffs point to facts that they contend demonstrate a variety of failures to provide meaningful notice or opportunity to be heard in connection with terminations of tenancies, grievance proceedings affecting tenancies, non-payment proceedings, warrant execution proceedings, and settlements affecting class members' tenancies. The Court will discuss the parties' evidence and arguments in the context of the various aspects of the proceedings that have been challenged.

(a) *Administrative Termination of Tenancy Proceedings*

■ As explained earlier, NYCHA maintains a complex internal administrative process, which includes adjudicative proceedings, for terminating tenancy rights for reasons other than non-payment of rent. The decision to take action adverse to a tenant's rights (whether termination or some sanction short of termination) is made by an IHO, subject to limited review by NYCHA's Board. The IHO conducts a trial-type hearing and makes his or her determination based on the record developed at the hearing. As NYCHA itself informs tenants in its hearing notices, "THIS HEARING WILL BE THE ONLY OPPORTUNITY TO BE HEARD, ... THE DETERMINATION BASED THEREON MAY RESULT IN ... EVICTION, AND ... SUCH DETERMINATION MAY NOT BE CHALLENGED IN THE LANDLORD–TENANT COURT." (*E.g.*, PX III/59 (December 11, 1995 Notice to Kenneth/Kelvin Blatch).) The IHO is not an advocate for either side, and does not play a role in developing the record. If the tenant does not appear at the hearing, the IHO makes the determination solely upon the record as presented by NYCHA.

Tenants must be afforded proper notice of these hearings in consideration of their circumstances or limitations, as well as a meaningful opportunity to be heard at the

hearings. *Mathews,* 424 U.S. at 349, 96 S.Ct. 893. "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard.'" *Id.* (quoting *Goldberg v. Kelly,* 397 U.S. 254, 268–69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)).

The undisputed evidence of record is sufficient to establish that NYCHA's procedures were, prior to the Segedy Memorandum, and remain, generally insufficient to protect the right of tenant class members to a meaningful opportunity to be heard in opposition to NYCHA's efforts to terminate or otherwise affect adversely their tenancies through the administrative process. The material undisputed evidence can be summarized as follows.

NYCHA does not present to IHOs information, known to NYCHA, that may indicate the presence of a mental disability on the part of the tenant. Furthermore, prior to December 1997, NYCHA had no formal procedures in place for evaluating the potential mental disability or competency of a tenant prior to the institution of tenancy termination proceedings, nor did NYCHA have any formal procedures authorizing IHOs to adjourn hearings and direct that referrals be made for such purposes. Defendant IHO Laurence's practice during that period was

> to go very slowly if there [was] a perceived mental defect, an effort to adjourn the case, to encourage a relative or legal service to enter the matter, or to encourage the Housing Authority to bring in [PSA]. And absent a capital P procedure, to move very slowly and see that individuals are protected as best they can be. My own mandate, at least until told these new capital P procedures [(referring to the Segedy Memorandum)], was to protect tenants in public housing. So, if somebody has a vermin harborage or fire hazard, or is causing great danger to his neighbors, that is a concern of mine. Nonetheless, always to move very slowly and protect the respondent, and explain anything to him or her.

Laurence Dep. at 29–30. The transcript of a 1996 hearing involving named Plaintiff Kenneth Blatch reflects just such an approach, in a situation in which the unrepresented tenant clearly gave delusional and irrational responses to Laurence's questions and (although NYCHA did not inform Laurence of the fact) NYCHA had long been aware of major psychiatric problems on the part of Blatch and his brother Kelvin. The Blatch brothers were both named in a notice proposing to terminate their tenancy for Non–Desirability on account of Kenneth's arrest in the lobby of their NYCHA building with a vial of crack. Kenneth appeared at the hearing, accompanied by his aunt (who is now acting as his Next Friend in the instant litigation), a cousin and a social worker. Kelvin did not appear.

The hearing transcript reveals that IHO Laurence did indeed try to speak slowly and clearly and to explain the charges to Kenneth. IHO Laurence even tried to suggest responses to Kenneth that might have provided bases for rejecting the Non–Desirability charge. (*See* Tr. of March 12, 1996 Hearing, Ex. C to Decl. of Karen Constant ("Blatch Tr.") at 6–7.) Kenneth instead, testified that he was a lawyer, Jesus Christ, a New York City Police Officer, a "cardinal in the Christian Church," a medical doctor, and "in personal contact with the President of the United States of America," and that he was "the only reason why people can walk the streets in New York City." (*Id.* at 8–9, 11, 19–20, 25–26.) He also testified that he had "been attending a group called mentally ill crack addicted young adults at the Harlem Out

Patient Clinic" and that the social worker in attendance at the hearing was "in charge of the group." (*Id.* at 10.) He made a number of statements against his own interest relating to crack smoking, despite IHO Laurence's admonitions to him that he had "said too much," that he "should just think before you speak" and that Laurence "only want[ed] to know good things about" Blatch. (*Id.* at 13, 15.) Blatch rebuffed Laurence's attempts to persuade him to let one of the accompanying people act as his representative. (*Id.* at 20–21.) The aunt testified, but was largely unresponsive to Laurence's attempts to elicit mitigating information from her. Neither the social worker nor the cousin testified. Laurence made no inquiry as to Blatch's brother Kelvin's whereabouts even though Kelvin was named as a respondent in the specification of charges.

Despite Laurence's specific queries to Kenneth and his aunt regarding Kenneth's "apparent schizophrenia" and whether there was any "legitimate medication" he could take,[21] Laurence did not inquire into whether Blatch was competent to represent himself and his brother, and the lawyer representing NYCHA proffered none of the extensive information in NYCHA's possession regarding the brothers' psychiatric history, including their extensive history of involvement with PSA and the New York State Department of Mental Health and the appointment of a guardian ad litem in connection with an earlier NYCHA attempt to evict them. (*See id.* at 35–39; Constant Decl. at 3; PR 56.1 ¶¶ 201–209; and NYCHA records referenced in Rep. of Philip Hauptman ¶ 50 (PX VII).) Rather, the NYCHA lawyer responded to Laurence's observation that "notwithstanding [Blatch's] very severe problems, ... he really doesn't bother other people" and

query as to whether there is "anything you can do for this man" and his "unfortunate" brother by "insist[ing]" on tenancy termination on the grounds that Kenneth was "a clear and present danger not only to his fellow tenants and to himself, but to the Project community at large." (Blatch Tr. 35–36.)

Laurence's written post-hearing decision, which was adopted by NYCHA's Board, found both Blatches ineligible for continued occupancy on grounds of Non-Desirability and breach of tenant rules and regulations and terminated the tenancy of both Blatches. Laurence's decision both acknowledged that "Kenneth is seriously mentally ill [and] Kelvin, less so" and found that Kenneth had "waived" his rights to counsel or other representative and to have the charges read. Laurence further found the charges "deemed proven" based upon Kenneth's testimony. (March 19, 1996 Decision and Disposition of Hearing Officer (PX III/62); April 3, 1996 NYCHA Determination of Status for Continued Occupancy (PX III/63)). NYCHA thereafter commenced a holdover proceeding against the Blatches in Housing Court. (November 15, 1996 Notice of Petition Holdover Licensee–Squatter (PX III/64).) It was the Blatches' cousin, not NYCHA's representative, who informed the Housing Court on the first court date that the Blatches "had mental problems." The Housing Court adjourned the matter in contemplation of PSA involvement. A guardian ad litem was eventually appointed, and a settlement was entered into after this class action litigation was commenced. (Constant Decl. ¶¶ 11–13; PR 56.1 ¶¶ 220, 222.)

The transcript of the Blatches' tenancy termination hearing makes it plain that Kenneth Blatch was not competent to rep-

---

21. Blatch Tr. at 25, 33.

resent himself, much less his brother, and that the subsequent determination to terminate their tenancy was made in violation of their due process right to a meaningful opportunity to be heard in connection with the deprivation of their tenancy rights. Indeed, Defendants' expert consultant reached the conclusion upon reading the transcript that Kenneth "was incompetent at the time ... I would say he was incompetent to make any legal decisions at the time" and, after this litigation was commenced, NYCHA's Deputy General Counsel recommended that the Board rescind the termination of tenancy decision "because the tenant, who attended the hearing without a representative or a guardian, has mental disabilities such that he cannot adequately defend his rights." (Goldstein Dep. (PX VIII § –2); August 14, 1997 Mem. to Members of the Board (PX III/65).)

NYCHA conducted a similarly problematic tenancy termination process in 1996 in the case of named Plaintiff Julia Gottlieb. Gottlieb, who was 71 at the time the motions were briefed, has been diagnosed with Schizoaffective Disorder and possible early dementia. Her conditions affect her thought processes, conduct and speech (PR 56.1 ¶¶ 278–281.) She does not acknowledge her mental disability or have insight into the problems it causes. (Id. ¶ 281.) NYCHA has been aware of Gottlieb's disability since 1985 and acknowledged in 1993 and 1994 that her mental condition had led to poor housekeeping problems that created unsafe conditions. (Id. ¶¶ 284–288; Memoranda dated March 28, 1994 and August 16, 1994 (PX IV/86).) It is undisputed that Gottlieb hoarded clothing and garbage in her apartment, creating sanitary and fire hazards, and that she had refused to accept cleaning and counseling services from agencies NYCHA had contacted on her behalf.

NYCHA commenced a termination of tenancy proceeding against Gottlieb by serving notices of tenancy termination charges on Gottlieb in August and November of 1996. The Specification of Charges accused Gottlieb of Non–Desirability and chronic breaches of rules and regulations, all relating to failure to keep her apartment clean and uncluttered. (PX IV/93.) Gottlieb appeared, unrepresented, for a hearing before IHO Laurence on December 20, 1996. She repeatedly informed Laurence that she would like to have a lawyer and would prefer not to represent herself; Laurence instructed her to "stop talking," and asked her to admit or deny the charges. (Gottlieb Tr. (PX IV/94) at 3–5.) Laurence asked her questions about the housekeeping charges and problems. Her answers were rambling and largely non-responsive and Laurence again instructed her to "stop talking" on numerous occasions. (Gottlieb Tr. at 6–12.) Laurence then invited her to testify, explaining that "the burden is on you to show me how and why you should stay in this apartment." Her response was to blame her husband for the clutter, ask for an opportunity to clean, sing a Christian hymn and relate anecdotes about her family members. (Id. at 13ff.) Laurence inquired of the NYCHA representatives whether NYCHA was willing to clean the apartment or have PSA clean it, but he made no inquiry into Gottlieb's psychiatric history or competency. NYCHA offered no information concerning Gottlieb's known psychiatric problems. (Id. at 10 ff.)

On December 30, 1996, Laurence issued his written decision as follows:

Tenant admits the charges and they are deemed proven.

Julia Gottlieb argued that she will, in her own time, clean up her apartment, but offered no testimony or other evi-

dence that could persuade the hearing officer of her bona fides.

Tenant is clearly disturbed and unable to manage her own affairs. The hearing officer hopes that she will allow the Authority into her apartment to effect a general cleaning and perhaps forestall her eviction. Nonetheless, on the current record the Housing Authority must have the right immediately to terminate this tenancy as it constitutes both a vermin harborage and fire hazard neither of which can be lawfully tolerated.

Laurence specified "termination" as the disposition. (PX IV/95.) NYCHA's Board adopted Laurence's decision and ordered the tenancy terminated on January 22, 1997. (*Id.*) NYCHA commenced a holdover petition against Gottlieb on July 15, 1997, and did not inform the Housing Court of Gottlieb's psychiatric problems. After Gottlieb obtained legal representation and filed an Article 78 proceeding through counsel, the Housing Court action was marked off the calendar; a guardian ad litem was appointed for Gottlieb in January 1988 by the state Supreme Court. (PR 56.1 ¶¶ 294–295.)

No rational factfinder could conclude, on the basis of the hearing transcript, that NYCHA afforded Gottlieb a meaningful opportunity to be heard in connection with the tenancy termination and eviction proceedings in 1996 and 1997. Defendants' and Plaintiffs' experts concur that Gottlieb's behavior at the hearing should have alerted the IHO to Gottlieb's incompetency to represent herself. (PR 56.1 ¶ 292.) On April 15, 1998, after Gottlieb moved to intervene in this class action, NYCHA's Deputy General Counsel recommended that the Board remand the tenancy termination proceeding on the ground that "[t]he tenant, who attended the hearing without a representative or guardian, may have mental disabilities such that she can-

not adequately defend her rights." (PX IV/97.)

Named Plaintiff Mark Bryer is a tenant who has been found by several different professionals, including Defendants' expert, Dr. Robert Goldstein, to suffer from chronic paranoid schizophrenia. NYCHA initiated tenancy termination and holdover proceedings against him based on poor housekeeping. Bryer's housekeeping problems consisted principally of hoarding empty cans and other garbage in his apartment. (Goldstein Rep. at 19; PR 56.1 ¶ 225; PX II/69.) Plaintiffs' and Defendants' experts concur that Bryer's hoarding activity is a product of his disability; Bryer believes that the collecting of the various objects ameliorates his various physical problems. (PR 56.1 ¶ 227.) Bryer does not acknowledge his mental disability, and his inability to acknowledge the disability is itself a manifestation of the disability. (*Id.* ¶ 229.) NYCHA file notes going back to 1992 document the hoarding problem, suspicions of mental problems and referrals to PSA, and assertions by Bryer of the health benefits of hoarding garbage. (PX III/71.) An April 14, 1995, report by an NYCHA social worker noted that Bryer received SSI "due to mental illness (which was determined by the PSA psychiatrist)," and that the social worker found him "somewhat paranoid." (PX II/74.)

Bryer appeared alone at his May 2, 1996, administrative tenancy termination hearing, explaining that his attorney could not be present because the attorney did not have enough notice of the hearing. (Bryer Tr. (PX II/75) at 3–5.) IHO Laurence nonetheless proceeded with the hearing, advising Bryer that the burden of proof was on NYCHA. During the course of the hearing, Bryer acknowledged that he had collected at least two hundred cans but did not seem to understand why his

apartment needed to be cleaned; he also accused the NYCHA of creating the mess in his apartment that was documented in photographs introduced by NYCHA at the hearing, asserting that NYCHA's disruption of his collection had exacerbated his asthma and caused a cockroach infestation. (*Id.* at 51–58.) Despite the fact that Bryer's attorney did not appear, and despite the facts that Bryer's testimony was plainly irrational at times and Bryer told the IHO that he did not understand how to ask questions of the NYCHA's witnesses, the IHO proceeded with the hearing, and following the hearing, recommended termination. (*Id.;* PX III/76.) Laurence did not inquire into or make any findings as to Bryer's competency to represent himself, nor was any effort made to secure any advocacy for him at the hearing. In his May 10, 1996, written determination, which was adopted by the Board on May 31, 1996, Laurence found that five of the charges were supported by substantial evidence and concluded: "Tenant rejected offers of assistance by management and stated on the record his refusal to reform his insanitary lifestyle. He would not let anybody into his apartment to restore order. Accordingly, there is no basis upon which to mitigate the disposition herein." (PX III/76.)

No rational fact finder could conclude, on the basis of the administrative termination hearing, that Bryer was competent to represent himself in defense of the charges; the termination of his tenancy rights was thus accomplished in violation of Bryer's right to due process.

NYCHA later commenced a holdover proceeding against Bryer in Housing Court, while Bryer, *pro se*, initiated an Article 78 proceeding. Following the in-

tervention of PSA, a guardian was eventually appointed for him pursuant to Article 81 of the New York State Mental Hygiene Law. (PR 56.1 ¶¶ 257–60.) According to Defendants' expert, "[w]ith the guardian's assistance and supervision, [Bryer] has for the first time been able to cooperate in cleaning up his apartment and limiting his accumulation of clutter." (Goldstein Rep. at 18.)

Although NYCHA now has in place a written policy under which at least those class members whom NYCHA believes meet the mental incapacity criteria set forth in the policy (GM–3630) are evaluated for competency prior to the commencement of termination proceedings, the evidence of record indicates that NYCHA in fact pursued proceedings in violation of this policy in a substantial number of class members' cases in the 1999–2000 period.[22] Plaintiffs have proffered declarations by Legal Aid attorney Samuel B. Davol, that, based on analyses of NYCHA tenant files, NYCHA Social Services Division records, Administrative Hearing Records, Housing Court records, Office of Housing and Department of Equal Opportunity records, and evaluations by psychiatric consultants performing services pursuant to GM–3630 which were produced by Defendants in discovery in this action, as well as of public court records involving proceedings to which the NYCHA was a party, demonstrate discrepancies in the 1999–2000 period between NYCHA's actual practices with respect to termination proceedings for mentally disabled tenants and the provisions of GM–3630 and other written procedures relied upon by Defendants. (Sealed Davol Decl. and documents cited

---

**22.** 1999–2000 is the most recent period as to which evidence is before the Court on these motions.

therein.[23]) Davol proffers that NYCHA claimed to have invoked GM–3630 procedures with respect to sixty-three class members. In sixteen of those cases, NYCHA nonetheless initiated or continued to pursue termination proceedings after referring the tenant for an evaluation and before the evaluation was completed. (*Id.* ¶ 10.) Davol further proffers that, in at least eleven cases, NYCHA was on notice that the tenant might have a mental disability yet pursued tenancy termination without making a referral to Social Services; in nine of those eleven cases, the tenants had identified themselves as mentally disabled on NYCHA's "Disability Status and Notice of Reasonable Accommodation Form." (*Id.* ¶¶ 24–25.)

Furthermore, as shown above, the testimony of NYCHA staff members involved in the tenancy termination and social services functions reveals inconsistent comprehension of criteria for identifying mental impairments to trigger evaluation referrals in the first place. Nor does the evidence of record support any inference that IHOs have been trained or properly equipped to handle competency issues in connection with hearings. Thus, class members clearly remain at risk of being summoned to hearings, and having adverse decisions taken with respect to their tenancies, without having had a meaningful opportunity to be heard.

Plaintiffs' factual proffers, even when the record is viewed in the light most favorable to NYCHA, suffice to carry Plaintiffs' burden of establishing that NYCHA's procedures for conducting administrative grievance and termination hearings are insufficient to protect mentally disabled tenants' due process rights to a meaningful opportunity to be heard. NYCHA's written procedures requiring evaluations and the suspension of proceedings prior to completion of such evaluations have not been implemented reliably at the pre-hearing stage. The evidence concerning the failure to take steps to ensure that class members who are not competent to represent themselves in response to charges are not deprived of their tenancies without a meaningful opportunity to defend themselves against the charges indicates that NYCHA's procedures are lacking at the crucial hearing stage as well.

The Due Process Clause of the Fourteenth Amendment prohibits NYCHA, as a government actor, from depriving mentally disabled tenants of their property interests without a meaningful opportunity to be heard on the question. NYCHA's procedures place this opportunity to be heard by a neutral fact finder at the pre-deprivation stage. Like other tenants, the mentally disabled are entitled to utilize representation to present and defend their position at the hearing. Where, however, the tenant is incapable of representing himself or herself competently, comprehending the proceedings or securing appropriate representation for himself or herself, the Constitution requires that NYCHA do more than make the deprivation determination on the basis of its Law Department's one-sided presentation. At a minimum, NYCHA is obligated to investigate appropriately the question of whether the tenant's mental faculties are sufficient to enable the tenant, personally or by a representative secured by the tenant, to present the tenant's side of the issue. Where that investigation indicates that the tenant lacks such ability, due process requires that NYCHA reach out to a suitable representative, possibly including a competent family member, or appoint or seek judicial appointment of an advocate or guardian, before conducting the hearing

---

**23.** Consideration of evidence presented in this form is permissible. *See* Fed.R.Evid. 1006.

and proceeding to a determination adverse to the tenant.

Where adverse action is taken against unrepresented mentally disabled tenants who are incapable of defending themselves meaningfully, the availability of appellate mechanisms or applications to reopen defaults later in the process does not cure the due process violation, as there is no reason to believe that such persons would have the wherewithal to engage those procedures any more meaningfully or effectively than they did in the hearing procedures.[24]

Eventual prevention of eviction through the engagement of outside agency or other intervention is also insufficient to cure the due process violation; although the occupancy may ultimately be preserved, action adverse to the tenancy rights (such as termination) will already have been taken as a predicate to issuance of the warrant of eviction. Such detriment to the tenant's protected tenancy rights is not necessarily eliminated by, for instance, a Marshal's refusal to carry out an eviction before PSA has a chance to consider assisting an at-risk tenant. Nor should the question of whether a person is deprived of a constitutionally protected interest in an NYCHA tenancy turn on the willingness of outside agencies to step in and protect the tenant from harm put in motion by NYCHA through constitutionally defective procedures.

Summary judgment is therefore granted in Plaintiffs' favor to the extent they seek a declaration that NYCHA's practices and procedures for conducting administrative tenancy termination hearings fail to protect mentally disabled tenants against deprivations of their tenancy rights without due process of law, and thus violate the Due Process Clause of the Fourteenth Amendment to the Constitution. Moreover, the Court finds that Plaintiffs will suffer irreparable harm (in the form of loss of Plaintiffs' homes or derogation of their protected tenancy rights) in the absence of injunctive relief, and that Plaintiffs are therefore entitled to injunctive relief mandating the establishment and implementation of appropriately comprehensive and effective procedures.

As the Court is not expert in NYCHA procedures, tenancy issues, mental disability issues or the tools that may be available to identify and evaluate mentally disabled tenants and, where necessary, provide them with meaningful assistance or representation in termination proceedings, the parties are directed to work with each other and with Magistrate Judge Pitman to negotiate and submit to the Court an appropriate proposed permanent injunction order. The Court expects the parties to address in their deliberations such issues as: any relevant changes in NYCHA's policies and practices since the briefing of the motions; an appropriate, uniform definition of mental disability for use in identifying competency issues; definitional language and training of relevant staff with respect to the identification of mentally disabled persons who may be incompetent to represent themselves or secure competent representation for themselves; notification to appropriate parties of the commencement of

---

**24.** *Cf. Escalera v. New York City Housing Auth.*, 425 F.2d 853, 866 (2d Cir.1970) ("Although upon commencement of an article 78 action, the holdover action by the HA may be stayed, the tenant must in effect prove that the HA decision was arbitrary and capricious or an abuse of discretion in order to get relief. Thus, the tenant has the burden of commencing an article 78 action and of overcoming the presumption of regularity attacking [sic] the acts of the HA .... Such review commenced by the tenant cannot be a substitute for fair procedures in the decision of the HA in the first instance." (footnote omitted)).

administrative termination proceedings; communication to the fact finder of all information in NYCHA's possession relating to competency, both in connection with live hearings and in connection with adjudications on default; appropriate standards for the consideration of applications to reopen default judgments where the applicant claims that the default was the result of a mental impairment (such standards should include consideration of information in NYCHA's possession relevant to the existence of such impairment and take due account of potential limitations arising from the disability on the applicant's ability to articulate extensively the reasons for the default [25]); and, for substantially the reasons explained in the next section, mechanisms for bringing to the attention of the Housing Court any information in NYCHA's possession relating to the potential mental impairment and/or competency of class members against whom NYCHA initiates holdover and eviction proceedings.

(b) *Non-payment Proceedings in Housing Court*

■ Plaintiffs also challenge NYCHA's practices in connection with summary rent non-payment proceedings brought against mentally disabled tenants in Housing Court. The Court finds that Plaintiffs are entitled to summary judgment against NYCHA on this claim to the extent they contend Plaintiff class members' due process rights have been violated by the failure of NYCHA and its representatives to communicate information regarding tenants' known or suspected mental disabilities to the court in the context of such proceedings, so as to enable the Housing Court to determine whether it is appropriate to appoint a guardian, secure intervention by outside agencies, or grant NYCHA relief by default.

The material undisputed evidence on this issue is as follows. NYCHA has no specific procedures for evaluating tenants in advance of non-payment proceedings or for suspending such proceedings where mental disability is known or suspected. GM–3630, which calls for such steps in connection with administrative tenancy termination procedures, is by its terms inapplicable to non-payment proceedings, which are brought directly in Housing Court. (PX II/15 at Q.33.) The non-payment of rent provisions of the 1995 MOU with HRA only apply to tenants who are receiving welfare benefits and do not contemplate HRA's intercession in the proceedings themselves on the tenant's behalf; rather, they provide HRA with an opportunity to cure the rent default. (PX II/9.)

Although NYCHA has a policy of referring "at risk" individuals involved in non-payment actions to its Non–Payment Review Unit, which works with social services agencies like PSA to obtain payment of rent arrears, such referrals are made only after the non-payment action has been commenced. There is no evidence that NYCHA informs the Housing Court of the tenant's "at risk" status, or of any information in its possession that may be relevant to the tenant's competency to defend the non-payment proceeding, if the efforts to obtain a cure of the arrears are unsuccessful and NYCHA proceeds to seek a

---

**25.** The deficiency in this regard of NYCHA's current procedures is suggested by the testimony of IHO Laurence, who stated that "a one-sentence letter" would not be sufficient to persuade him to reopen a default on such grounds and that an application citing medication being taken for a mental disability and asserting that the mental disability prevented the tenant from coming to the hearing would be "too speculative," but that "a cogent letter suggesting why somebody did not appear for a hearing, giving an explanation, would very likely get a reopening." Laurence Tr. (PX VI) at 109–111.

judgment of possession or warrant of eviction. Although NYCHA's policies call for notification of the City Marshal before an "at-risk" eviction is carried out, such notification comes only after an adjudication adverse to the tenant's rights and is irrelevant to the question of a meaningful opportunity to be heard before such adverse action is taken.

In the 1999–2000 period, NYCHA pursued non-payment proceedings, notwithstanding unresolved GM–3630 referrals for evaluations,[26] in the cases of thirty-one of the sixty-three class members for whom GM–3630 referrals for possible guardianship had been initiated. (Sealed Davol Decl. ¶ 13. )[27] Plaintiffs' review of relevant files revealed that NYCHA had obtained warrants of eviction for twenty-two of the sixty-three class members who had been referred under GM–3630 before the GM–3630 evaluation had been conducted, and also failed to designate as "at-risk" twenty of those eviction cases. (*Id.* ¶ 14.) Plaintiffs add that three of the class members referred under GM–3630 were evicted prior to the evaluation for potential Article 81 guardianship. (*Id.* ¶ 15.) Plaintiffs' summary further shows that, of fifteen NYCHA residents evaluated pursuant to GM–3630 during the period, the consultant found nine incompetent and recommended the appointment of a guardian. In four of those cases, NYCHA nonetheless initiated or pursued Housing Court non-payment actions without seeking appointment of a guardian or even disclosing the consultant's competency findings to the Housing Court. Warrants of eviction were obtained in two of the nine cases, again without a guardianship application. (*Id.* ¶¶ 19–20.)

In addition, Plaintiffs' summary proffers that tenant files and NYCHA documents revealed that NYCHA was on notice that eleven residents, nine of whom had responded affirmatively to the Disability Status and Notice of Reasonable Accommodation form, were mentally disabled, but NYCHA did not initiate GM–3630 proceedings for them. NYCHA initiated non-payment or holdover actions with respect to nine of those individuals and did not inform the Housing Court that the tenant might have a mental disability. Warrants of eviction were obtained in three of the cases; none of the three was flagged as "at-risk." At least one of those individuals was, according to Plaintiffs' summary, actually evicted. (*Id.* ¶¶ 24–26, 28–31.)

Plaintiffs' review of the Housing Court or administrative termination files of sixty-three class members who had previously been referred to evaluation pursuant to GM–3630 revealed no indication that NYCHA informed the trier of fact that a GM–3630 evaluation had been requested and that the respondent might have had a mental disability. (*Id.* ¶ 13.) In the case of named Plaintiff Olga Alsaa, Defendants were reprimanded for that failure by the

---

**26.** As noted above, GM–3630 does not, by its terms, apply to non-payment proceedings but, to the extent that the basis for invoking GM–3630 is suspicion that a tenant may not be competent, existence of the GM–3630 referral is indicative of knowledge on the part of NYCHA that a tenant also may not be able properly to defend a non-payment of rent action.

**27.** The record includes evidence that in the case of one class member, Beatrice R., the NYCHA initiated a non-payment action in

Housing Court one month after NYCHA's expert, Dr. Goldstein, had found her incompetent and in need of an Article 81 guardian. (PX S–19, S–21) As Defendants contend that this action was the isolated result of a staff member's misreading of the evaluation as a competency finding, the Court does not take the evidence regarding Beatrice R. into account in determining whether the undisputed evidence warrants judgment in Plaintiffs' favor.

Housing Court judge, who found that NY-CHA had an affirmative duty to disclose to the court that Alsaa was a client of PSA and that she was clearly "at-risk". (PX III/47.) Alsaa and her family had already been evicted before these facts were brought to the court's attention, and it was only upon a motion to vacate the warrant of eviction that Alsaa was restored to possession of her home. (*Id.*)

Defendants contest Plaintiff's due process claim relating to Housing Court proceedings on three principal grounds. First, NYCHA disclaims responsibility for any due process issues on the basis that any property deprivation arising from the proceedings is by virtue of the action of the Housing Court rather than any internal NYCHA tenancy termination processes. Second, NYCHA asserts that section 159 of New York's Public Housing Law precludes it from disclosing to the Housing Court information regarding tenant's mental status. Third, NYCHA contends that its existing policies and procedures are sufficient to protect class members' due process rights in connection with non-payment proceedings.

The Court rejects NYCHA's contention that its actions in connection with non-payment proceedings have no due process implications. Unlike a private litigant, NYCHA is a government actor. In initiating non-payment proceedings it is utilizing its power, as a governmental landlord, to affect adversely a protected property right. If (as explained above) it cannot directly deprive its tenants of due process by denying them a meaningful opportunity to be heard in opposition to tenancy termination charges brought in its own administrative proceedings, it cannot do so indirectly by invoking procedures that operate on the presumptive basis of equal capability of litigants to present their positions while concealing from the court informa-

tion that could call into question that basic presumption. NYCHA's actions in this regard are particularly pernicious from the constitutional point of view where it seeks Housing Court relief by default against tenants whose mental disabilities it has perceived as sufficiently serious to warrant initiation of a GM–3630 process or as to whom NYCHA possesses information indicative of a mental disability that could prevent the tenant from participating meaningfully in the process.

Indeed, the importance of disclosure to the tribunal of potential mental disabilities is so central to the integrity of judicial determinations that it is well settled that even a private plaintiff has statutory and common-law obligations to come forward with information that the party against whom he seeks relief may be mentally disabled and therefore unable to adequately represent himself. *See Parras v. Ricciardi*, 185 Misc.2d 209, 710 N.Y.S.2d 792, 795–97 (2000) ("It is the [landlord's] obligation to bring the [tenant's] possible mental incompetency to the Court's attention . . . ."); *see also Oneida Nat'l Bank v. Unczur*, 37 A.D.2d 480, 326 N.Y.S.2d 458, 461–62 (4th Dep't 1971) (interpreting CPLR 1201 and CPLR 1203, guardian ad litem statutes, and holding that default could not be granted without appointment of guardian ad litem); *cf.* Fed.R.Civ.P. 55 (providing for entry of judgment by default where defendant "is not an infant or incompetent person"). For instance, where NYCHA knows that a tenant is mentally disabled and that tenant fails to appear for a hearing, it is critical to the court's proper exercise of its powers that the judicial officer know that there may be a reason, other than acquiescence in NYCHA's position, for the tenant's absence. Indeed because, as explained above, some mentally disabled persons may not understand or acknowledge the existence or effects of their impairments, NYCHA may

be in a unique position to bring material information to the court's attention in this regard. Any concern regarding potential invasions of tenants' privacy can surely be dealt with through provisions for in camera or other confidential submission of the information.

■ NYCHA's Public Housing Law section 159 argument fares no better. The statutory prohibition of disclosure is by its terms inapplicable to actions, like the Housing Court non-payment proceedings at issue here, in which NYCHA is itself a party. N.Y. Pub. Hous. Law § 159 (McKinney 1997); see also Wilson v. New York City Housing Auth., No. 96 Civ. 1765(SHS)(HBP), 1996 WL 524337, at *2 n. 4 (S.D.N.Y. Sept. 16, 1996).

Finally, as shown in the Court's factual summary above, NYCHA's existing practices and procedures, while constituting important measures that may in fact prevent some unwarranted evictions, do not address the mentally disabled tenant's right to be heard meaningfully in connection with the adjudication of the non-payment allegations and therefore are insufficient to obviate or cure the due process violation effected by NYCHA's practice of non-disclosure.

Accordingly, Plaintiffs are granted summary judgment against NYCHA on their Third Cause of Action to the extent that the Court finds and declares that NYCHA's practice of pursuing non-payment proceedings in Housing Court without informing the tribunal of information in its possession that may suggest that the tenant is incapable of meaningfully participating in the proceedings (whether evidenced by pending GM–3630 referrals, prior appointments of guardians in connection with similar proceedings, or otherwise) violates the Plaintiff class members' rights under the Due Process Clause of the Fourteenth Amendment to the Constitution.

Because the Court finds that affected class members will suffer irreparable harm (in the form of loss of their homes or derogation of their protected tenancy rights) in the absence of injunctive relief, an injunction requiring NYCHA to communicate the relevant information to Housing Court will issue. The parties are directed to work with each other, under Magistrate Judge Pitman's supervision, to formulate an appropriate proposed permanent injunction order.

### 5. Fourth Cause of Action—Improper Settlements

■ Plaintiffs assert that NYCHA has an unlawful practice of entering into settlements adversely affecting tenancy rights with unrepresented Plaintiffs who are known or suspected to be mentally disabled. In the Davol declaration, Plaintiffs represent that the records reviewed show that seventeen class members entered into stipulations modifying or terminating their tenancies while a GM–3630 evaluation was pending (an indication that NYCHA at least suspected that the tenant might be in need of a guardian at the time the stipulation was negotiated). (Sealed Davol Decl. ¶ 12.)

Plaintiffs have proffered facts pertaining to stipulations involving one of the named class members, Flora Cruz, as well as class member Bruce Montgomery. Ms. Cruz, a Spanish-speaking person who has been diagnosed as suffering from Chronic Paranoid Schizophrenia, Major Depression and Chronic Anxiety Disorder, as well as from a number of serious physical conditions, entered into a stipulation with NYCHA following the commencement of administrative tenancy termination proceedings relating to her son's alleged possession of drugs on project grounds. (PR 56.1 ¶¶ 263, 265, 266; PX III/80.) Plaintiff

Cruz asserts that she disclosed her mental disability to an NYCHA attorney, that NYCHA attorneys would not permit a family member to accompany her into meetings and interpret for her, and that an NYCHA attorney pressured her to sign a stipulation that she did not understand. The stipulation provided, *inter alia,* for the permanent exclusion of her son from NYCHA property, surprise inspections of her apartment for an indefinite period, and one year of "probation" status. Cruz asserts that she did not understand that the stipulation barred the son from visiting her home and from entering project grounds to accompany her to medical appointments. (PR 56.1 ¶¶ 268–70; PX III/82.) Defendants deny that they had any prior notice that Cruz claimed a mental disability and dispute Plaintiffs' argument that the currently available information is indicative of a limitation that would have a negative impact on Cruz's ability to comply with the terms of her tenancy or with the stipulation. (Decl. of Mark Friedman ¶¶ 5–13.)

In the case of Bruce Montgomery, Plaintiffs proffer that NYCHA, despite having notice that Montgomery had a mental disability for which he had been hospitalized on more than one occasion, brought a nonpayment action in Housing Court and took a default judgment against him when he failed to appear in court. (PX II/19 (Decl. of Linda Johnson and Aff. of Bruce Montgomery).) When Montgomery discovered the default judgment, he moved for an Order to Show Cause but, before the motion was heard, NYCHA's Housing Assistant persuaded Montgomery to sign an agreement to vacate his apartment. On the scheduled hearing date, the Housing Assistant informed Montgomery that he did not have to stay in court because the agreement to vacate had been signed. Plaintiffs further allege that the agreement, which is not included in the record

before the Court, specifically cited Montgomery's mental disability as the reason for vacating the apartment and stated that Montgomery was unable, due to his mental disability, to understand his rights or make appropriate decisions about the apartment. The matter never came before the Housing Court and, because Montgomery vacated his apartment pursuant to the agreement rather than under a warrant of eviction, there was no opportunity for the Marshal to refer Montgomery to PSA or make other provisions for him as an at-risk person. (*Id.*)

There remains a genuine issue of material fact as to whether NYCHA's practice of negotiating settlement stipulations in tenancy-related matters directly with unrepresented tenants is appropriately protective of the due process rights of mentally disabled tenants. The Court cannot determine on the current record whether Cruz, Montgomery or any other class members who may have entered into stipulations relinquishing tenancy rights or opportunities to challenge earlier adverse determinations, were sufficiently able to comprehend the nature of the transactions to that their due process rights were not violated. The foregoing facts, viewed in the light most favorable to Plaintiffs, could support a conclusion that NYCHA's practice violates class members' rights to due process but are also susceptible of interpretation in Defendants' favor. Accordingly, the parties' motions must be denied insofar as they relate to the due process implications of NYCHA's settlement practices.

C. *Rehabilitation Act/Fair Housing Amendments Act/Americans with Disabilities Act Claims*

In addition to alleging that the policies and practices described above violate class members' due process rights, Plaintiffs'

First through Fourth Causes of Action assert that those policies and practices violate class members' rights as mentally disabled persons under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* (the "ADA"), and the Fair Housing Amendments Act, 42 U.S.C. § 3604 (the "FHAA" and, together with Section 504 and the ADA, the "Disability Rights Statutes").

■ Section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance...." 29 U.S.C.A. § 794(a) (West 1999). NYCHA does not dispute that it receives federal financial assistance and is therefore a "program or activity" within the meaning of the statute.[28] In order to show a violation of Section 504 of the Rehabilitation Act, a plaintiff must show:

> (1) that he has a disability for purposes of the Rehabilitation Act, (2) that he is 'otherwise qualified' for the benefit that has been denied, (3) that he has been 'denied the benefits' solely by reason of his disability, and (4) that the benefit is part of a 'program or activity receiving Federal financial assistance.'

*Flight v. Gloeckler,* 68 F.3d 61, 63 (2d Cir.1995) (internal citations omitted).

The FHAA prohibits, inter alia, discrimination on the basis of handicap in the rental of a dwelling to any renter, and defines "discrimination" to include "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal *opportunity* to use and enjoy a dwelling." 42 U.S.C.A. §§ 3604(f)(2), 3604(f)(3)(B) (West 2004).

Title II of the ADA provides in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C.A. § 12132 (West 1995). Justice Department regulations implementing Title II of the ADA[29] provide in relevant part that

> A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability -
>
> .   .   .   .   .
>
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or

---

**28.** It is at best unclear whether the individually-named Defendants, Hernandez and Laurence, are proper parties to Plaintiffs' claims under the Disability Rights Statutes. To the extent the claims survive this motion practice, the Court expects that Plaintiffs will either clarify the nature and basis of the claims against those defendants or discontinue those claims.

**29.** In section 12134 of the statute, Congress directed the Attorney General to promulgate regulations implementing Title II. By virtue of this congressional delegation, the Department of Justice Regulations and commentaries thereto should be accorded "controlling weight unless [they are] 'arbitrary, capricious, or manifestly contrary to the statute.'" *Yeskey v. Commonwealth of Pennsylvania Dept. of Corr.,* 118 F.3d 168, 171 (3d Cir.1997), *aff'd,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (citation omitted); *see also John Does 1–5 v. Chandler,* 83 F.3d 1150, 1153 (9th Cir.1996).

service that is not equal to that afforded others;

[or]

(iii) Provide a qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

28 C.F.R. § 35.130(b)(1) (2005). The regulations further obligate public entities to

make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

*Id.* § 35.130(b)(8). The regulations also make it clear that the utilization of modifications, aids or services on the part of disabled persons is voluntary:

Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

*Id.,* § 35.130(e)(1).

The regulations also contain several important caveats relevant to the scope of the accommodation and modification obligations imposed on public entities, including provisos that

[T]his part does not prohibit discrimination against an individual based on that individual's current illegal use of drugs.

28 C.F.R. § 35.131(a)(1)(2005); and that

This part does not require a public entity to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting or dressing.

28 C.F.R. § 35.135 (2005). The Justice Department's official commentary to the regulations reiterates this latter limitation on the provision of services in aid of accommodation, stating that, although a public entity cannot place disproportionate burdens on the disabled, such as requiring a disabled person to be accompanied by an attendant, "[a] public entity is not ... required to provide attendant care, or assistance in toileting, eating or dressing to individuals with disabilities, except in special circumstances, such as where the individual is an inmate of a custodial or correctional institution." 28 C.F.R. Part 35, App. A (2005). The commentary also makes it clear that section 35.135 of the regulations, which contains the limitation regarding personal devices and services, "serves as a limitation on all of the requirements of the regulation" and applies "not only to auxiliary aids and services but across-the-board to ... other relevant areas such as, for example, modifications in policies, practices and procedures." *Id.*

In order to establish a prima facie case for violation of Title II of the ADA, a plaintiff must show that:

(1) he is a 'qualified individual with a disability'; (2) he is being excluded from participation in or being denied the benefits of some service, program, or activity by reason of his disability; and (3) the entity which provides the service, program or activity is a public entity.

*Civic Ass'n of the Deaf of New York City v. Giuliani,* 915 F.Supp. 622, 634 (S.D.N.Y. 1996) (internal citations omitted). NYCHA does not dispute that it is a "public entity" within the meaning of the statute.

■ Because the standards for discrimination against the disabled are interpreted similarly in the Rehabilitation Act, ADA, and FHAA, Plaintiffs' Disability Rights Statutes claims can be analyzed together. *See Toyota Motor Manuf., Ky. Inc. v. Williams,* 534 U.S. 184, 193–94, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 334 (2d Cir.1995) (noting that Congress relied on Rehabilitation Act standards in drafting the FHAA); *Lincoln Cercpac v. Health and Hosp. Corp.,* 977 F.Supp. 274, 279–80 (S.D.N.Y.1997) (holding that the requirements for establishing a Rehabilitation Act violation are similar to those for establishing an ADA violation); *see also* 42 U.S.C.A. § 12133 (West 1995) (adopting Rehabilitation Act remedial provisions for ADA Title II violations); 28 C.F.R. 35.103(a)(2005) ("Except as otherwise provided … [the ADA Title II regulations] … shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 … or the regulations issued by Federal agencies pursuant to that title."); 28 C.F.R. Part 35 App. A (2005) ("Because title II of the ADA essentially extends the antidiscrimination prohibition embodied in section 504 to all actions of State and local governments, the standards adopted in this part are generally the same as those required under section 504 for federally assisted programs.").

As previously noted and as will be discussed in more detail below, a principal criterion of a viable cause of action under the Disability Rights Statutes is the plaintiff's status as an individual with a disability who is qualified for the subject program, activity or service. Although the class is defined to consist of "mentally disabled" persons, the Court has not yet determined that any particular members of the class in fact meet all of the legal criteria for protection under these statutes by reason of their mental impairments,[30] and Defendants dispute the qualified status of several of the named Plaintiffs. For purposes of analysis of certain of Plaintiffs' claims, however, the Court will assume that the class includes qualified individuals with disabilities who are protected by the reasonable accommodation and/or program modification provisions of the Disability Rights Statutes.

*1. First and Second Causes of Action*

■ Plaintiffs' First and Second Causes of Action, relating to the provision of guardians or expert representatives for every mentally disabled person who may be the subject of tenancy termination, grievance or non-payment proceedings, fail as class claims under the Disability Rights Statutes for substantially the same reasons that undermined the viability of Plaintiffs' class-wide due process claims on these issues. Essentially, Plaintiffs have failed to come forward with evidence sufficient to demonstrate that the particular remedy sought—appointment of a guardian or representative, and suspension of proceedings pending such appointment—is a necessary and therefore reasonable accommodation in every case of mental disability.

Furthermore, such individualized personal aids or assistance are beyond the scope of reasonable accommodations mandated by the Disability Rights Statutes. Like prescription eyeglasses made to meet an individual's particular vision deficits or assistance with personal hygiene, individualized guardianship, analytical or advocacy services are personal aids, the provision of

---

**30.** *See Blatch v. Franco,* No. 97 Civ. 3918(DC), 1998 WL 265132 (S.D.N.Y. May 26, 1998) (granting motion to intervene); December 1, 1999 order granting Rule 23(b)(2) class certification in *Blatch v. Franco,* No. 97 Civ. 3918(DC) (S.D.N.Y.).

which is not required by the statutes, particularly as there is no evidence in the current record that NYCHA provides such assistance to persons who are not mentally disabled. *Compare* 28 C.F.R. § 35.135 (personal devices and services not required) *with* 28 C.F.R. § 35.130(b)(I) (prohibiting denial of qualified individual with disability of "the opportunity to ... benefit from ... aid, benefit or service" provided by public entity). Accordingly, Defendants' summary judgment motion is granted as to Plaintiff's First and Second Causes of Action insofar as they assert class claims under the Disability Rights Statutes.

> 2. *Third and Fourth Causes of Action—Class Claims Regarding Reasonable Accommodations*

(a) *Identification and Outreach Issues*

■ Plaintiffs' Third Cause of Action, which generally alleges failure to make reasonable accommodations in connection with tenancy-related proceedings, is susceptible to class analysis (again assuming that the class includes qualifying individuals) to the extent it challenges NYCHA's system for identifying persons who may be disabled and for offering accommodations to such persons, and to the extent Plaintiffs contend that certain measures could constitute reasonable accommodations.

The Department of Justice's regulations implementing Title II of the ADA provide that

> A public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part.

28 C.F.R. § 35.106 (2005). It is undisputed that NYCHA's principal formal mechanism for the identification of mentally disabled persons who may be in need of accommodation is self-identification in response to annual inquiries that are sent to tenants of record in connection with NYCHA's annual income review procedure. Defendants have proffered uncontroverted evidence that more than 15,000 of the agency's 180,000 tenants have used the form to identify themselves or members of their household as such persons in need of accommodation due to mental disabilities. Indeed, some of the named Plaintiffs have completed the form. Others, however, have not, and it is undisputed that certain mental disabilities may lead individuals to deny, or fail to perceive, their impairments.

NYCHA has also established a Department of Equal Opportunity, designed to assist disabled residents in securing reasonable accommodations, and has appointed a Section 504 Coordinator to manage an internal grievance procedure relating to reasonable accommodations. (DR 56.1 ¶¶ 17, 19.) It is also apparent from the record that NYCHA becomes aware of, and takes action both in and outside the context of tenancy termination proceedings involving, persons (such as named Plaintiffs Bryer and Gottlieb) who do not voluntarily self-identify as disabled and in need of accommodation.

Plaintiffs do not dispute the existence of these mechanisms, but contend that the Disability Rights Statutes require additional and more extensive mechanisms for reaching out to identify mentally disabled tenants and residents in order to offer and provide reasonable accommodations to such persons. Plaintiffs also contend that

some of the functions that NYCHA has established to aid disabled persons are understaffed, ill-trained and ineffective, and have proffered evidence of the existence of alleged class members who do not appear on NYCHA's official lists of persons identified as mentally disabled. Furthermore, although there is no evidence that NYCHA specifically reiterates its notice of the opportunity to self-identify, and to request accommodation, in the context of tenancy termination, grievance, or non-payment proceedings, there is evidence that NYCHA offered at least some of the named Plaintiffs tenancy-related assistance or accommodations prior to or in connection with such proceedings and was refused.

NYCHA argues that its obligation to initiate communications regarding the availability of reasonable accommodations is satisfied by the annual mailing of the "Disability Status and Notice of Reasonable Accommodation" form and that it has no obligation under the Disability Rights Statutes to provide accommodations to mentally disabled tenants who have not specifically requested them, on the form or otherwise. The record, which includes evidence that some mentally disabled persons may not be able to self-identify in accordance with NYCHA procedures, and that termination and Housing Court proceedings are brought on against mentally disabled persons who may not be competent to defend themselves, raises material issues of fact and related legal questions as to whether NYCHA's practices are sufficient to meet its notification and accommodation obligations under the Disability Rights Statutes, particularly in cases where NYCHA's interactions with tenants, or the involvement of guardians or social services agencies in prior proceedings, indicates the existence of disability and/or competency issues.

As case law and related regulations recognize, a request for accommodations may be interposed on behalf of a disabled person. *See Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 313 (3d Cir.1999) (noting that a family member or other representative may articulate a request for reasonable accommodation, and citing 2 EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 20–21). Furthermore, the need for accommodations may not be apparent until tenancy-threatening issues arise, and such issues may not exist at the time of the annual mailing.

There are also material factual issues on the current record as to whether the definitions of mental incapacity, competency and at-risk status employed by NYCHA in identifying and offering services to potentially mentally disabled persons are sufficient to capture the group protected by the Disability Rights Statutes. The operative disability definition under the Disability Rights Statutes looks to such issues as the existence of an impairment, the degree (if any) to which the impairment limits the person's ability to perform major life functions, and the qualification of the person to receive the benefit, or participate in the program in question. *Bragdon v. Abbott*, 524 U.S. 624, 637, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Lincoln Cercpac*, 977 F.Supp. at 280. NYCHA's written policies relating to tenancy termination proceedings look to the Article 81 definition of incapacity, which focuses on inability to care for oneself and/or danger to self or others, "at-risk" status, which again appears to focus on the ability to care for oneself and somewhat amorphous notions of mental incapacity, and competency to defend oneself in internal termination proceedings (a criterion central to the due process issues raised in this case but not necessarily coextensive with the protections of the Disability Rights Statutes). The written policy relating to liaison with HRA in connection with non-payment pro-

ceedings turns on welfare eligibility. It also appears that NYCHA defers in some instances to PSA eligibility determinations in considering whether to accommodate a disability at all; PSA's eligibility criteria have not been shown to be co-extensive with the coverage of the Disability Rights Statutes.

Plaintiffs may be able to demonstrate that, at least where NYCHA has reason to believe that a person may be suffering from a mental disability, NYCHA has an obligation to provide additional notifications (to emergency contact persons or others who may be working with the tenant) of the right to request accommodations at the time a tenancy-threatening issue arises. Similarly, Plaintiffs may be able to demonstrate that NYCHA's responses to notifications of disabilities are insufficient such as, for instance, where termination or non-payment proceedings are brought against persons known to be hospitalized [31] or requests to reopen default judgments that cite mental problems are rejected, without further inquiry, for failure to explain in detail the precise effect of the disability and its connection to the default.[32] The factual record is susceptible of construction in favor of either party and, thus, summary judgment on this claim must be denied insofar as it relates to NYCHA's practices concerning identification of the mentally disabled and notification and outreach relating to reasonable accommodation for such disabilities.

(b) *Accommodations that are Beyond the Scope of the Disability Rights Statutes' Requirements*

Plaintiffs' arguments and expert evidence in support of their reasonable accommodation arguments make it clear that they have conflated with the dictates of the Disability Rights Statutes obligations that may arise under other provisions of law, and that some of the accommodations they seek are, as a matter of law, beyond the scope of the reasonable accommodation/modification requirements imposed on NYCHA by the Disability Rights Statutes. Accordingly, the Court addresses certain of Plaintiffs' arguments at this time.

Plaintiffs' expert report links the reasonable accommodation arguments with policy arguments relating to the deinstitutionalization of the mentally disabled, and presumes that public housing providers such as NYCHA have an obligation to function as housing of last resort. (*See* Hauptmann Rep. ¶ 75 (discussing Mark Bryer).) Plaintiffs' expert's critique of NYCHA's actions focuses on avoidance of homelessness or institutionalization of disabled tenants, and on "less restrictive approaches" to the treatment or housing of the disabled. (*see, e.g., id.*) rather than on the specific requirements and limitations of the Disability Rights Statutes, which in relevant part require NYCHA to make reasonable program modifications to facilitate the accessibility of its low-income housing program. For the reasons that follow, Defendants' summary judgment motion is granted and Plaintiffs' Third Cause of Action is dismissed, to the extent Plaintiffs seek any of the following measures by way of reasonable accommodation under the Disability Rights Statutes.

(i) *Waiver or Modification of Rules Relating to Illegal Drug Use*

█ Plaintiffs' arguments regarding failure to "accommodate" drug use-related

---

**31.** *See* Johnson Decl. (PX II/9) at ¶¶ 9–14 (class member Bruce Montgomery); PR 56.1 ¶¶ 42–51, at 88–99 (named Plaintiff Louise Smalls).

**32.** Laurence Dep. (PX VI) at 106–113.

tenancy issues must fail to the extent they suggest that waiver or modification of drug use prohibitions would be a reasonable modification. An individual who is a current illegal drug user is exempted from the definition of "qualified individual with a disability" if action is being taken on account of the illegal drug use. 28 C.F.R. § 35.104 (2005); 29 C.F.R. § 1630.3(a) (2005). Thus, neither the mentally-disabled status of a current illegal drug user against whom action is taken based on that drug use, nor the mentally-disabled status of a person who depends on the drug user for assistance, is a viable basis for a claim that NYCHA is required to accommodate the disabled person by changing its generally-applicable rules relating to such activity.

This does not mean, however, that due process and other procedural issues in connection with the action to be taken can be ignored, or that accommodations in terms of procedural approaches to the problem might not be required. Nor, of course, does it mean that drug-related prohibitions and lease provisions can be enforced any more strictly against mentally disabled persons than they are against non-disabled persons.

### (ii) *Involuntary Measures*

■ It is undisputed that at least some of the named Plaintiffs have refused ameliorative measures, such as cleaning services, when offered by NYCHA. Julia Gottlieb refused even to permit social services and NYCHA representatives enter her apartment. Mark Bryer refused to consent to outside cleaning to ameliorate his housekeeping problems. As previously noted, persons suffering from some mental disabilities deny or do not realize that they are in need of help.

Plaintiffs nonetheless argue that NYCHA has an obligation to impose accommodations on such persons, such as through the commencement of Article 81 guardianship proceedings, as necessary to enable them to remain in their apartments. However, whatever obligations City government may have to take such steps to protect mentally disabled persons, they do not stem from the Disability Rights Statutes. The Disability Rights Statutes neither require nor authorize NYCHA to impose measures on disabled individuals by way of seeking to accommodate their disabilities or to obviate adverse consequences of refusal or inability to recognize their disabilities. The reasonable accommodation process under the Disability Rights Statutes is a voluntary one, contemplating requests for accommodation and an interactive process of arriving at mutually acceptable accommodations or modifications. Thus, where accommodations not only are not requested but are actively resisted by the disabled person, the obligation to accommodate arguably does not even arise. *See, e.g., Walsted v. Woodbury County, Iowa,* 113 F.Supp.2d 1318, 1334–37 (N.D.Iowa 2000) (discussing interactive process for reasonable accommodation).

Even if it can be said that an obligation to extend the opportunity for accommodations nonetheless exists, the Department of Justice regulations under the ADA make it quite clear that a public entity is not empowered to require a person to accept any particular accommodations:

> Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

28 C.F.R. § 35.130(e)(1) (2005). Thus, while NYCHA might have an obligation to work with a person or outside agency acting on a mentally disabled person's behalf in making accommodations to facilitate the

success of the representative's efforts to secure guardianship or put involuntary ameliorative measures in place, the Court rejects Plaintiffs' claims of failure to make reasonable accommodation insofar as they are premised on the notion that NYCHA has an obligation under the Disability Rights Statutes to impose financial management, guardianship or other ameliorative measures on mentally disabled tenants who do not seek or wish to accept such accommodations. Such personalized measures are also outside the scope of accommodations required by the Disability Rights Statutes, as explained below.

### (iii) *Individualized Aids or Services*

As explained above, the Disability Rights Statutes do not require a public entity to provide individualized aids or services by way of reasonable accommodation or program modification. Thus, Plaintiffs' arguments that NYCHA is obligated under those statutes to provide personal financial management, apartment cleaning or other individualized services to mentally disabled tenants as reasonable accommodations or program modifications to accommodate the disabilities fail as a matter of law. However, to the extent NYCHA provides such services to non-disabled persons (such as the elderly, welfare recipients or other "at-risk" persons), the Disability Rights Statutes do require that NYCHA make such services equally available to mentally disabled persons. (*See supra* section II.C.) (quoting 28 C.F.R. § 35.130(b)(1) (2005)).

### (iv) *Outplacement Upon Eviction*

Plaintiffs argue that NYCHA has violated class members' rights by failing to have in place procedures for "ensuring that residents with mental disabilities are evicted to appropriate settings (*e.g.*, a nursing home, residential psychiatric facility)." (PR 56.1 ¶ 128; Hauptmann Rep. at ¶ 201.) Whatever obligations NYCHA or other government authorities may have to ensure such appropriate outplacement, they do not arise under the Disability Rights Statutes, which are concerned with equal access to the programs and facilities of the particular public entity. NYCHA is a provider of housing; nothing in the record suggests that its programs include particularized outplacement services for people leaving public housing, whether by reason of eviction or otherwise. Indeed, the record is clearly to the contrary: NYCHA's practice appears to be limited to notification of the City Marshal and/or PSA when an eviction involves persons "at risk" and, as discussed above, NYCHA's consistency in making even those notifications is haphazard at best.

Nor is there anything in the record to support the notion that the housing services NYCHA provides include outplacement, or that outplacement would serve the goals of the Disability Rights Statutes by combating discrimination in NYCHA's federally-funded programs,[33] affording "equal opportunity to use and enjoy a dwelling,"[34] preventing exclusion of the disabled "from participation in or be denied the benefits of the services, programs, or activities of [NYCHA]" or preventing "discrimination by such entity."[35] Furthermore, to the extent this type of placement may be construed to come within the realm of potential accommodations under the Disability Rights Statutes, it, like the individualized services discussed in the preceding section, is excluded from the

---

**33.** *Cf.* 29 U.S.C.A. § 794(a) (West 1999).

**34.** *Cf.* 42 U.S.C.A. §§ 3604(f)(2), 3604(f)(3)(B) (West 2004).

**35.** *Cf.* 42 U.S.C.A. § 12132 (West 1995).

statutory mandate by 28 C.F.R. § 35.130(b)(1).

To be sure, if NYCHA were to provide such placement services for non-disabled persons, it would have to afford mentally disabled persons equal access to such services. The record does not, however, support any inference that NYCHA's programs include such services.

##### (v) *Other Reasonable Accommodation Claims*

The remainder of Plaintiffs' claims concerning lack of reasonable accommodation or other Disability Rights Statute violations are not susceptible to class-based treatment under Rule 23(b)(2), which only authorizes the Court to entertain class claims where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Qualified-individual-with-a-disability status is necessarily particularized when the question is whether mental impairments limit major life activities in ways that are relevant to the policies, procedures and accommodations that are at issue here. Reasonable accommodation issues are likewise specific to the circumstances and needs of particular individuals.

Furthermore, Defendants have proffered facts demonstrating that there are material factual and legal issues that cannot be resolved on the current record as to whether even some of the named Plaintiffs are qualified individuals with disabilities. Plaintiffs' argue, for instance, that receipt of SSI disability payments should be conclusive of the substantial limitation question. The record before the Court demonstrates, however, that some Plaintiffs' disability payments are based on physical, rather than mental impairments and thus are not evidence that the person's mental impairment results in a substantial limitation as to one or more major life activities. *See, e.g.,* Goldstein Rep. at 22 (noting that Louise Smalls receives SSI benefits as a result of physical disabilities); Aff. of Evelyn Witt (discussing physical disabilities of Erica Mortimer). Defendants, relying on *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), further argue that some Plaintiffs fail to qualify as covered individuals because the limitations imposed by their impairments can be managed with appropriate pharmacological or other treatment. This argument implicates individualized issues of fact (as to whether such amelioration is in fact possible) and of law, in that *Sutton* did not address a situation in which the very impairments that could be managed through treatment lead the individual to be noncompliant with the treatment program.

NYCHA also argues that some of the Plaintiffs are excluded from "qualified" status as individuals who pose a direct threat to the health or safety of others. Such a "direct threat" is one that "cannot be eliminated by a modification of policies, practices or procedures or by the provision of [covered] auxiliary aids or services." *See* 28 C.F.R. Pt. 35 App. A (2005); 28 C.F.R. § 36.208 (2005). NYCHA contends, for instance, that the housekeeping problems that underlay the tenancy termination proceedings brought against Plaintiffs Gottlieb and Bryer rendered those individuals direct threats. Material issues of fact remain as to the degree of threat raised by their behavior and as to whether any reasonable modification could have ameliorated such threat. Whether appropriate accommodations were requested or offered, and what accommodations would have been reasonable in a particular case,

are also issues of fact for determination on an individualized basis.

The Court construes Plaintiff's Disability Rights Statutes claim regarding NYCHA's entry into settlements with unrepresented persons, as asserted in the Fourth Cause of Action, as one relating to reasonable accommodation as well. For substantially the reasons explained in the preceding paragraphs, as well as the reasons explained in the Court's earlier discussion of the due process element of this claim, it is not susceptible of resolution on a class basis.

The Court therefore treats the disability discrimination claims asserted in Plaintiffs' Third and Fourth Causes of Action as class claims solely to the extent (1) they present the issue of whether NYCHA makes sufficient efforts to identify mentally disabled tenants and extend to them opportunities for reasonable accommodation, and (2) to the extent the Court holds that certain accommodations are beyond the scope of the Disability Rights Statutes as a matter of law. The remaining disability discrimination issues are not appropriate for continued litigation on a class basis under Rule 23(b)(2) and the Court hereby determines, in accordance with Rule 23(c)(4) of the Federal Rules of Civil Procedure, that this action shall no longer be maintained as a class action with respect to those claims.

To the extent Plaintiffs' reasonable accommodation claims are asserted as individual claims on behalf of the named Plaintiffs, the parties' respective motions for summary judgment are denied because genuine issues of material fact remain to be resolved.

### D. *Plaintiffs' Claim for Class Relief Under State Law*

▮▮▮ In their Fourth Cause of Action, Plaintiffs assert that NYCHA's practice of entering into settlements with unrepresented mentally disabled persons "is arbitrary and capricious [and] ... lacks substantial evidence" as well as violative of the Fourteenth Amendment and the Disability Rights Statutes. (Am.Compl.¶ 220.) Plaintiffs cite no basis in federal law for the review of such an alleged practice, or of individual settlements, as arbitrary and capricious or lacking substantial evidence. The Court construes this claim as one seeking to invoke the review standard provided under New York State law, specifically Article 78 of the Civil Practice Law and Rules, which permits review of administrative actions by the New York State Supreme Court on abuse of discretion and substantial evidence grounds, among others. *See* N.Y. C.P.L.R. §§ 7804 (special proceeding to be brought "in the supreme court" in relevant county), 7803 (questions that may be raised include whether a determination was arbitrary or capricious and whether a determination upon an evidentiary hearing was supported by substantial evidence). This claim must be dismissed for lack of subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims. *Cartagena v. City of New York,* 257 F.Supp.2d 708, 710 (S.D.N.Y.2003); Vincent C. Alexander, Practice Commentary C7804:2 to N.Y. C.P.L.R. § 7804(b) (McKinney 1994); *see also* Fed.R.Civ.P. 12(h)(3) (requiring federal court to dismiss an action whenever it appears that the Court lacks subject matter jurisdiction).

### E. *Individual Claims*

The parties' motions for summary judgment are denied with respect to the named Plaintiffs' individual claims for relief except to the extent specified in this section.

▮▮▮ The Court finds and declares that NYCHA violated the due process rights of Kenneth and Kelvin Blatch insofar as it

failed to give them a meaningful opportunity to be heard at the March 12, 1996, administrative tenancy termination hearing concerning the charges set forth in NYCHA's December 11, 1995, notice. The Court further finds and declares that NYCHA violated the due process rights of Kenneth and Kelvin Blatch insofar as it failed to inform the Housing Court, in connection with the subsequent holdover proceeding, of information in its possession indicating that they suffered from mental impairments.

The Court further finds and declares that NYCHA violated the due process rights of Julia Gottlieb insofar as it failed to give her a meaningful opportunity to be heard at the December 20, 1996, administrative tenancy termination hearing concerning the charges set forth in NYCHA's August 1996 and November 1996 notices. The Court finds and declares that NYCHA violated Julia Gottleib's due process rights insofar as it failed to inform the Housing Court, in connection with the subsequent holdover proceeding, of information in its possession indicating that she suffered from one or more mental impairments.

The Court further finds and declares that NYCHA violated Mark Bryer's due process rights insofar as it failed to give him a meaningful opportunity to he heard at the May 2, 1996, administrative tenancy termination hearing concerning the charges set forth in NYCHA's February 10, 1995, notice. The Court also finds and declares that NYCHA violated Mr. Bryer's due process rights insofar as it failed to inform the Housing Court, in connection with the subsequent holdover proceeding, of information in its possession indicating that he suffered from one or more mental impairments.

The individually-asserted claims set forth beginning at paragraph (6) of the Prayer for Relief in the Amended Class Complaint are addressed as follows.

*Paragraph (6): Erica Mortimer—Administrative Termination Decision*

Plaintiff Mortimer seeks a declaration that a default decision of Defendant Laurence terminating her tenancy, later certified by NYCHA's Board, was "arbitrary and capricious and lack[ed] substantial evidence on the record." This claim is dismissed for lack of subject matter jurisdiction, for the reasons set forth in section II.D. of this Opinion.

*Paragraph (7): Erica Mortimer—Eviction Proceedings*

Plaintiff Mortimer seeks a final judgment enjoining an eviction proceeding pending against her in Housing Court, "until a proper hearing is held in which Ms. Mortimer is represented by a qualified attorney or some other appropriate representative who is experienced in NYCHA tenancy termination proceedings, Housing Court matters, and the rights of people with mental disabilities." To the extent that proceeding remains pending, Mortimer is granted relief as to this claim only insofar as NYCHA is directed to convey to the Housing Court (subject to appropriate confidentiality measures) information in its possession relating to Plaintiff's mental condition, in order to enable the Housing Court to determine whether appointment of a guardian or another protective measure is required. This claim is dismissed in all other respects.

*Paragraph (8): Flora Cruz—Stipulation*

Plaintiff Cruz seeks a declaration that a settlement stipulation into which she entered with NYCHA, permanently excluding her son from her apartment and the grounds of the public housing project in which she resides and placing her on general probation for a year, "is arbitrary and

capricious and a denial of due process and federal law [sic] ... and is null and void." To the extent this claim is asserted pursuant to Article 78, it is dismissed for lack of subject matter jurisdiction. To the extent Plaintiff claims that she was denied due process in the negotiation of the stipulation, the summary judgment motions of both parties are denied because Plaintiff Cruz' ability meaningfully to engage in such negotiations cannot be determined on the current record.

*Paragraph (9): Peggy O'Neill Morton—Default Tenancy Termination*

Plaintiff Morton seeks a declaration that a default decision terminating her tenancy is null and void as arbitrary and capricious and lacking substantial evidence. For the reasons previously explained, this claim is dismissed for lack of subject matter jurisdiction.

*Paragraphs (10) and (11): Natalie Jenkins—Default Tenancy Termination; Pending Eviction Proceeding*

Plaintiff Jenkins was struck from this action as a named Plaintiff by an Order of this Court, adopting a Report and Recommendation of Magistrate Judge Pitman, dated March 5, 2002. Her individual claims for relief are, accordingly, dismissed.

*Paragraph (12): Mark Bryer—Stipulation of Settlement and Decision Terminating Tenancy*

This claim, which seeks a declaration of invalidity on the basis that the referenced measures were arbitrary and capricious and lacked substantial evidence, is dismissed for lack of subject matter jurisdiction.

*Paragraph (13): Mark Bryer—Pending Eviction Proceeding*

Plaintiff Bryer seeks a final judgment enjoining an eviction proceeding pending against him in Housing Court, "until a proper hearing is held in which Mr. Bryer is represented by a qualified attorney or some other appropriate representative who is experienced in NYCHA tenancy termination proceedings, Housing Court matters, and the rights of people with mental disabilities." Bryer is granted relief as to this claim to the extent NYCHA is directed to convey to the Housing Court (subject to appropriate confidentiality measures) information in its possession relating to Plaintiff Bryer's mental condition, in order to enable the Housing Court to determine whether appointment of a guardian or another protective measure is required. This claim is dismissed in all other respects.

*Paragraph (14): Louise Smalls—Default Tenancy Termination*

Plaintiff Smalls seeks a declaration that default decisions and dispositions terminating her tenancy are null and void as arbitrary and capricious and lacking substantial evidence. For the reasons previously explained, this claim is dismissed for lack of subject matter jurisdiction.

*Paragraph (15): Louise Smalls—Pending Eviction Proceedings*

Plaintiff Smalls seeks a final judgment enjoining eviction proceedings pending against her in Housing Court, "until a proper hearing is held in which Ms. Smalls is represented by a qualified attorney or some other appropriate representative who is experienced in NYCHA tenancy termination proceedings, Housing Court matters, and the rights of people with mental disabilities." Smalls is granted relief as to this claim to the extent NYCHA is directed to convey to the Housing Court (subject to appropriate confidentiality measures) information in its possession relating to Plaintiff Smalls's mental condition, in order to enable the Housing Court to determine whether appointment of a guardian

or another protective measure is required. This claim is dismissed in all other respects.

*Paragraph (16): Luis Perez—Default Tenancy Termination*

Plaintiff Perez seeks a declaration that default decisions and dispositions terminating his tenancy are null and void as arbitrary and capricious and lacking substantial evidence. For the reasons previously explained, this claim is dismissed for lack of subject matter jurisdiction.

*Paragraph (17): Luis Perez—Pending Eviction Proceedings*

Plaintiff Perez seeks a final judgment enjoining eviction proceedings pending against him in Housing Court, "until a proper hearing is held in which Mr. Perez is represented by a qualified attorney or some other appropriate representative who is experienced in NYCHA tenancy termination proceedings, Housing Court matters, and the rights of people with mental disabilities." Perez is granted relief as to this claim to the extent NYCHA is directed to convey to the Housing Court (subject to appropriate confidentiality measures) information in its possession relating to Plaintiff Perez's mental condition, in order to enable the Housing Court to determine whether appointment of a guardian or another protective measure is required. This claim is dismissed in all other respects.

*Paragraph (18): Olga Alsaa—Pending Eviction Proceedings and Tenant of Record*

Plaintiff Alsaa seeks a final judgment enjoining eviction proceedings pending against her in Housing Court and seeking to establish Vanessa Clark as the tenant of record for purposes of "ensuring the continuous tenancy of the Alsaa/Clark family and avoiding tenancy disputes in the future." Because there are material issues of fact as to whether there were due process and/or Disability Rights Statutes violations warranting such relief, the both parties' motions for summary judgment are denied as to this claim.

## III. CONCLUSION

For the foregoing reasons:

Defendants' motion for summary judgment is granted, and Plaintiffs' motion is denied in all respects, insofar as Plaintiffs' Amended Class Action Complaint asserts due process claims on behalf of class members who are occupants, rather than tenants of record (or persons eligible at relevant times for treatment as tenants of record under applicable regulations and procedures) of NYCHA properties;

Defendants' motion for summary judgment is granted, and Plaintiffs' motion is denied, with respect to the due process and Disability Rights Statutes claims asserted by Plaintiffs in the First and Second Causes of Action of the Amended Class Action Complaint;

Plaintiffs' motion for summary judgment is granted as against Defendant NYCHA on the Third Cause of Action asserted in the Amended Class Action Complaint insofar as the Court finds that NYCHA's practices and procedures for conducting administrative tenancy termination hearings fail to protect mentally disabled tenants against deprivations of their tenancy rights without due process of law, thus violating the Due Process Clause of the Fourteenth Amendment to the Constitution, and the parties are directed to negotiate and submit to the Court a proposed form of permanent injunction order;

Plaintiffs' motion for summary judgment is also granted as against Defendant NYCHA to the extent Plaintiffs' Third Cause of Action challenges, on due process grounds, NYCHA's practice of withholding

information concerning tenants disabilities from the Housing Court, and the parties are directed to negotiate and submit to the Court a proposed form of permanent injunction order;

Both summary judgment motions are denied with respect to Plaintiffs' Third Cause of Action insofar as it is asserted pursuant to the Disability Rights Statutes and relates to NYCHA's practices concerning identification of mentally disabled tenants and notification and outreach relating to reasonable accommodation for such disabilities;

Defendant's motion for summary judgment is granted, and Plaintiffs' Third Cause of Action is dismissed, to the extent set forth in Section II.C.2.(b) of the foregoing Opinion;

Plaintiffs' Disability Rights Statutes claims asserted in their Third and Fourth Causes of Action will be treated as class claims only to the extent (1) they present the issue of whether NYCHA makes sufficient efforts to identify mentally disabled tenants and extend to them opportunities for reasonable accommodation, and (2) the Court holds, as explained in section II. C.2.(b) of the foregoing Opinion, that certain accommodations are beyond the scope of the Disability Rights Statutes as a matter of law;

The Amended Class Complaint is dismissed for lack of subject matter jurisdiction to the extent it asserts class claims for relief under state law on the basis that challenged actions were arbitrary and capricious actions and/or actions not based on substantial evidence;

Plaintiffs' motion is granted as to individual named Plaintiffs' claims to the extent specified in section II. E. of this Opinion; and

The parties' motions are denied in all other respects.

The parties shall promptly make arrangements to meet with Magistrate Judge Pitman for negotiation of the injunction orders authorized by this Opinion and, to the extent further litigation is required, to address any outstanding pretrial management issues.

SO ORDERED.